1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MALANJE PHEA,                        No.  2:20-cv-00283 WBS GGH P

12              Petitioner,

13        v.                              ORDER AND FINDINGS AND
                                          RECOMMENDATIONS
14   CHRISTIAN PFEIFFER, Warden,

15              Respondent.

16

17   *Introduction and Summary*

18        Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  The matter was referred to a United States Magistrate

20   Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

21   At times, judges and lawyers  must think that they have "seen it all" with respect to procedural

22   twists and turns. This case proves that there is always a new path to be fashioned.

23        Petitioner was convicted of 33 counts of sexual misconduct with minors.  The Second

24   Amended Petition (SAP) indicates that petitioner was sentenced to 46 years and 4 months.

25   Petitioner raises claims concerning the admission of what has become known as "propensity"

26   evidence and expert testimony regarding the reactions of abused children. He has also raised

27   ineffective assistance of counsel claims with respect to admission of the above evidence.

28   ////

1

1  For the reasons set forth herein, petitioner has not exhausted his ineffective assistance of
2  counsel claims; he has procedurally defaulted the primary evidentiary claims[1],  and in any event,
3  the primary claims are presently not cognizable in federal habeas corpus. Finally, even if the
4  ineffective assistance claims are reviewed on its merits, they too must fail.

5  *Factual Background*

6  The issues to be resolved in this habeas action do not require a full recitation of the
7  lengthy and depressing facts. They are set forth in the partially published <u>People v. Phea</u>, 25 Cal.
8  App. 5th 583 (2018). The entire appellate opinion, found at ECF Nos. 36-1; 37-56 is referenced
9  herein and attached as Appendix A. To the extent necessary, the facts necessary for discussion are
10  set forth in the individual discussion sections.

11  *Issues Presented*

12  As set forth in the SAP, the issues are as follows:

13  1.    Review should be granted to determine if Evidence Code Section 1108 violates
14       [petitioner's] due process rights to a fair trial;

15  2.    Review should be granted to determine if Section 1108 as applied here violated the
16       14th Amendment due process guarantee; and

17  3.    Review should be granted to determine if  Child Sexual Abuse Accommodation
18       Syndrome ("CSAAS") evidence violates due process.

19  The Traverse, ECF No. 50, contains a hodge-podge of varying contentions and exhibits,
20  only a couple of which are germane to the issues raised. The issues set forth in the SAP will not
21  be expanded even if the undersigned could fathom from the Traverse what those issues might be.

22  *Procedural Background*

23  After conviction and judgment, petitioner, represented by counsel, appealed. With respect
24  to the primary issues, the court found that petitioner had forfeited his claim that Cal. Evid. Code
25  Section 1108 (propensity evidence) was unconstitutional on its face and as applied. ECF No. 36-1
26  at 26-27. The court also held forfeited any contention that CSAAS evidence violated due process.

27
28  _____

[1] For sake of clarity, the claims which do not rely on asserted ineffective assistance will be termed "primary" claims to distinguish them from ineffective assistance claims.

1  Id. at 56.  The court went on to deny the merits of petitioner's ineffective assistance of counsel

2  claims on the above issues finding that both state and federal law dictated that an objection would

3  have been unmeritorious. The appellate court made other findings not germane to the issues here.

4         The petition for review made it to the California Supreme Court, ECF No. 37-57

5  abandoned the ineffective assistance of counsel claims and ignored the appellate court holding

6  that petitioner had forfeited the issues raised herein. Evidently, the petition was meant to catch the

7  eye of the California Supreme Court on the merits of the forfeited issues without arguing the

8  "baggage" of forfeiture and ineffective assistance of counsel. The petition for review was denied.

9  ECF No. 37-58.

10        Thereafter, petitioner made a number of successive state habeas corpus petitions, none of

11  which address the issues here. See ECF Nos. 60 through 67. Petitions were filed in the California

12  Court of Appeal, but again, these are irrelevant to the issues here.

13  *Discussion*

14        A.  Exhaustion

15        In order to exhaust state proceedings in order to qualify for federal habeas, one must take

16  a habeas claim to the highest state court. Beaty v. Stewart, 303 F.3d 975, 987 (9th Cir. 2002)

17  (citing Duncan v. Henry, 513 U.S. 364, 365 (1995)); McNeeley v. Arave, 842 F.2d 230, 231 (9th

18  Cir. 1988). "Unexhausted claims may be procedurally defaulted. *See*, *e.g*., *Reese v. Baldwin*, 282

19  F.3d 1184, 1190 (9th Cir.2002). A claim is procedurally defaulted 'if the petitioner failed to

20  exhaust state remedies and the court to which the petitioner would be required to present his

21  claims in order to meet the exhaustion requirement would now find the claims procedurally

22  barred.' *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)."

23  Beaty, supra, at 987.

24        As set forth above, petitioner explicitly abandoned his ineffective assistance of trial

25  counsel claims when presenting the petition for [direct] review before the California Supreme

26  Court.  In order for these claims to now be exhausted, petitioner would have to file a state habeas

27  petition with the California Supreme Court. Although in California there is no rigid, set time limit

28  for bringing a habeas claim before the state supreme court, habeas petitioners must bring their

3

1   habeas claims without substantial delay. <u>Martin v. Walker</u>, 562 U.S. 307, 312 (2011).

2   Undoubtedly, given this set of circumstances, petitioner would be barred from proceeding on this

3   claim in the California Supreme Court. Therefore, it is possible to assert that the ineffective

4   assistance of counsel claims are procedurally defaulted. <u>See</u>, <u>e.g.</u>, <u>Cockett v. Ray</u>, 333 F.3d 938,

5   943 (9th Cir. 2003).[2]

6          However, respondent has not moved to default the ineffective assistance of trial counsel

7   claims; respondent simply observes the unexhausted status. Petitioner has not asked to stay this

8   case in order to exhaust such a claim. Nevertheless, even if requested, the undersigned would

9   recommend denial. One cannot assert diligence for the bringing of a claim when it was knowingly

10  abandoned during state proceedings. And, in order to have a timely claim, a <u>Rhines</u>[3] stay would

11  have to be authorized—a request which requires diligence in the bringing of a claim. Moreover,

12  the result of exhaustion at this time would undoubtedly be a finding that the claim was not timely

13  for state review purposes. Finally, for the reasons set forth, <u>infra</u>, any ineffective assistance of

14  trial counsel claim would be denied on its merits.

15  ////

16  ////

17  _____

    [2]

18

19          Because Cockett has procedurally defaulted her Confrontation
    Clause claim, she "may not raise the claim in federal habeas, absent
20  a showing of cause and prejudice or actual innocence." *Wells v.
    Maass*, 28 F.3d 1005, 1008 (9th Cir.1994). Cockett contends that the
21  ineffective assistance of her trial and appellate counsel constitutes
    cause for her default. To constitute cause for procedural default of a
22  federal habeas claim, the constitutional claim of ineffective
    assistance of counsel must first have been presented to the state
    courts as an independent claim. *Murray v. Carrier*, 477 U.S. 478,
23  488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).  Because Cockett's
    claim of ineffective assistance of trial counsel was procedurally
24  defaulted, trial counsel's performance cannot constitute cause.
    Therefore, we review only her claim of ineffective assistance of
25  appellate counsel to determine whether it constitutes cause.

26  <u>Cockett v. Ray</u>, 333 F.3d 938, 943 (9th Cir. 2003)

27          In this case, no claim for ineffective assistance of appellate counsel has been asserted, nor
    would it be exhausted.
28          [3] <u>Rhines v. Weber</u>, 544 U.S. 269 (2005).

    4

1    The undersigned finds that the ineffective assistance of trial counsel claim is unexhausted.

2    Nevertheless, the undersigned will recommend a denial of the claim on its merits, _infra._ See 28

3    U.S.C. § 2254(b)(2).

4        B.   Procedural Default of the Primary Claims

5        As set forth in the Procedural Background Section, the Court of Appeal found that

6    petitioner had forfeited his claim to Section 1108 constitutionality (both facially and as applied)

7    by failing to object. The same is true for the CSAAS expert evidence. Respondent does argue that

8    the prejudicial evidence claims (both the Cal. Evid. Code 1108 (propensity evidence) and the

9    expert CSAAS evidence) are procedurally defaulted. Respondent is correct.

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " _Kindler_, 558 U.S., at 55, 130 S.Ct., at 615 (quoting _Coleman v. Thompson_, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. _See Sykes_, 433 U.S., at 81–82, 90, 97 S.Ct. 2497.
>
> Ordinarily, a state prisoner seeking federal habeas relief must first "exhaus[t] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), thereby affording those courts "the first opportunity to address and correct   alleged violations of [the] prisoner's federal rights," _Coleman_, 501 U.S., at 731, 111 S.Ct. 2546. The adequate and independent state ground doctrine furthers that objective, for without it, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." _Id._, at 732, 111 S.Ct. 2546. Accordingly, absent showings of "cause" and "prejudice," _see Sykes_, 433 U.S., at 84–85, 97 S.Ct. 2497, federal habeas relief will be unavailable when (1) "a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds." _Coleman_, 501 U.S., at 729–730, 111 S.Ct. 2546.
>
> ***
>
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed". _Kindler_, 558 U.S., at 60 – 61, 130 S.Ct., at 618 (internal quotation marks  omitted). [Fn. 4 omitted]. "[A] discretionary state procedural rule," we held in _Kindler_, "can serve as an adequate ground to bar federal habeas review." _Id._, at 60, 130 S.Ct., at 618. A "rule can be 'firmly established' and 'regularly followed,' " _Kindler_ observed, "even if

28   ////

1    the appropriate exercise of discretion may permit consideration of a
2    federal claim in some cases but not others." *Id*., at 60 – 61, 130 S.Ct., at 618.

3   Walker, supra, at 315-316.

4          Failure to object is a time-honored procedural default. See Wainright v. Sykes, 433 U.S.

5   72, 86-87; Leavitt v. Arave, 682 F.3d 1138 (9th Cir. 2012); Rich v. Calderon, 187 F.3d 1064,

6   1069-70 (9th Cir. 1999); Flores v. Hickman, 533 F.Supp. 2d 1068, 1082-83 (C.D. Cal. 2008).

7   Petitioner did not seek review of the forfeiture holdings; they are established for federal habeas

8   purposes.[4]

9          Procedural default may be excused if petitioner shows "cause" for the lack of objection,

10   and "prejudice" therefrom. In order to show cause, a petitioner must demonstrate "that some

11   objective factor external to the defense impeded counsel's efforts to comply with the State's

12   procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986).  "Attorney error short of

13   ineffective assistance of counsel does not constitute cause for a procedural default." Murray, 477

14   U.S. at 492; Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

15          Here, petitioner ignores the procedural default claimed in the Answer.  As stated above,

16   petitioner's Traverse does not appear to be directed at anything germane to his petition in any

17   event.  The court cannot find cause and prejudice from silence or legal static.

18          Nor does the rule of Martinez v. Ryan, 566 U.S. 1 (2012), aid petitioner. The rule is a

19   narrow exception to the general procedural default rule that derelictions of counsel do not excuse

20   procedural default.

21    We consequently read *Coleman* as containing an exception, allowing
22    a federal habeas court to find "cause," thereby excusing a defendant's
      procedural default, where (1) the claim of "ineffective assistance of
      trial counsel" was a "substantial" claim; (2) the "cause" consisted of
23    there being "no counsel" or only "ineffective" counsel during the

24          [4] Of course, petitioner could not cure his forfeiture default in the state courts by just
25   ignoring such in the petition for review. Although the California Supreme Court denied the
     petition for review without comment on the merits of the primary claims sought to be reviewed,
26   common sense directs the conclusion that petitioner must accept the unappealed procedural
     holdings of the intermediate court and/or that in such a situation, the state supreme court would be
27   presumed to have included both procedural and substantive grounds as reasons for denial. See
     Wilson v Sellers, 138 S.Ct. 1188 (2018) (silent denial by a higher court is presumed to encompass
28   the reasoned findings of the lower court).

1
2
3
4

> state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding." *Martinez*, *supra*, at ——, 132 S.Ct., at 1318–1319, 1320–1321.

5   Trevino v. Thaler, 569 U.S. 413, 423 (2013).

6        Petitioner's problem here is that the primary claims at issue for procedural bar are not

7   ineffective assistance of counsel, but rather general, substantive claims.  Moreover, petitioner

8   does not even have an exhausted ineffective assistance claim.  Thus, the primary claims of due

9   process violation are defaulted.

10  Finally, even if the primary claims were not defaulted, they are not cognizable in federal habeas

11  corpus.  See below.

12        C.  None of the Claims Have Merit

13        The Supreme Court has not announced that the admission of evidence, claimed to be

14  unlawfully prejudicial, violates the Due Process clause.

15
16
17
18

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. *Musladin*, 549 U.S. at 77.

19
20
21
22
23
24
25

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." *Musladin*, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ on the basis of Holley's additional claims.

26        Holley v. Yarborough, 568 F.3d 1091, 1101 fn. 2 (9th Cir. 2009) (emphasis added)

27  (noting that if it were free to rule on the issue, the Ninth Circuit would have found a violation of

28  due process.)

7

1    See also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008); Alberni v. McDaniel, 458

2    F.3d 860, 866 (9th Cir. 2006); Soojian v. Lizarraga, No. 1:16-cv-00254-AWI-SAB-HC, 2018 WL

3    3155617 (E.D. Cal. June 25, 2018); Jones v. Spearman, No. 16-cv-03627-JD, 2018 WL 424402,

4    at *4 (N.D. Cal. Jan. 16, 2018); Garcia v. Madden, No. EDCV 17-00049-DOC (JDE), 2018 WL

5    910184, at *15 (C.D. Cal. Jan. 5, 2018).

6        Holley and its progeny did not hold that if the court believes a serious due process

7    violation exists, it is free to rule on the issue of admission of prejudicial evidence. "Without

8    power to rule" means just that— it does not mean "sometimes has the power to rule and

9    sometimes not." Moreover, the mere characterizing of a prejudicial evidence claim as a

10   fundamentally unfair "due process" violation would render the Holley rule useless, i.e., the claim

11   of admission of prejudicial evidence would be reviewed on the merits, regardless, every time

12   since all due process claims in habeas corpus must rise to the level of  fundamental unfairness to

13   be actionable. Again, the Ninth Circuit has held otherwise:

14
> Zapien also argues that the admission of Perez's statements was such
15
> an egregious violation of California evidentiary law that it
> constituted a due process violation. It is not at all clear that there was
16
> a violation of California law, let alone one so fundamentally unfair
> that it amounted to a due process violation. In any event, we've held
17
> that, "[u]nder AEDPA, even clearly erroneous admissions of
> evidence that render a trial fundamentally unfair may not permit the
18
> grant of federal habeas corpus relief if not forbidden by clearly
> established [Supreme Court precedent]." Holley v. Yarborough, 568
19
> F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks omitted).

20   Zapien v. Davis, 849 F.3d 787, 794 (9th Cir. 2015).[5]

21       Thus, it does not matter whether the evidence analysis of the Court of Appeal was spot on,

22   dubious, or unreasonable. No cognizable federal claim exists. Petitioner could cite Dawson v.

23   Delaware, 503 U.S. 159 (1992) for the proposition that overtly prejudicial evidence may be a due

24   process violation. However, the difference between Dawson and the instant case, as well as the

25   ////

26       [5] See also Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006).  The undersigned
     follows the Holley/Zapien rule.  Finally, Kipp v. Davis, 971 F.3d 939, 956 (9th Cir. 2020), is not
27   to the contrary as the court in that case found that AEDPA did not apply.  It therefore determined
     the issue de novo and found that McKinney v. Rees, 993 F.2d 1378, 1381-82, 1385-86 (9th Cir.
28   1993) (barring improper propensity evidence), stated the applicable rule on propensity evidence.

1    cases cited above, is that the Aryan Brotherhood evidence introduced in <u>Dawson</u> was totally

2    irrelevant as well as prejudicial. <u>Dawson</u> found the due process violation because of the lack of

3    relevance, not simply because it was prejudicial. Petitioner does not contest the relevance of the

4    evidence herein—just that it was prejudicial. Relevance makes all the difference as to whether

5    one can state a federal claim in habeas involving the admission of prejudicial evidence.

6        Moreover, the issue is not just "propensity evidence" versus "due process."  A sea change

7    in evidence law has occurred transforming the formerly all encompassing "do not admit"

8    propensity evidence, with limited exceptions, <u>see</u> <u>McKinney v. Rees</u>, 993 F.2d 1378 (9th Cir.

9    1993), to a nearly no holds barred admission of propensity evidence in sexual assault, domestic

10   abuse or pedophile cases. Cal. Evid. Code §§ 1108, 1109; <u>United States v. Lemay</u>, 260 F.3d 1018

11   (9th Cir. 2001).[6] While one can question "what changed" in terms of due process, i.e., what was

12   once unfair becomes "fair," legislatures make known the policy of the times, and it is difficult for

13   courts from a policy standpoint to tell legislatures "they got it wrong." At least, a lower court may

14   not do so in an AEDPA case without direction by the U.S. Supreme Court.[7]

15       The unexhausted ineffective assistance of counsel claims (for failing to object to

16   admission of the above evidence) follows a different analytical track, but ultimately fail as well.

17       The undersigned is unaware of cases which detail how to handle an ineffective assistance

18   claim based on primary claims which are not AEDPA cognizable. That is, can counsel be

19   ineffective with respect to a claim not recognized by AEDPA. The ineffective assistance claim is

20   certainly cognizable *per se*, and the thrust here is that counsel should have recognized that

21   "ordinary" federal law would have precluded the evidence, if counsel had only objected.[8] It is

---

22       [6] The only check on carte blanche admission is whether the prejudice of the prior acts

23   evidence outweighs the probative value. Cal. Evid. Code § 352; Fed. R. Evid. 403.  However, in
     practice, the more serious the prior misconduct and the more serious the charged crime,

24   admission of the evidence will almost always have a greater probative value than prejudice.

25       [7] The new way of looking at prior misconduct in sex assault or domestic abuse cases has
     not deterred courts from finding error in admitting prior misconduct in "ordinary" crime cases.

26   <u>See</u>, <u>e.g.</u>, <u>United States v. Bailey</u>, 696 F.3d 794 (9th Cir. 2012); <u>United States v. Santini</u>, 656 F.3d
     1075 (9th Cir. 2011); <u>United States v. Carpenter</u>, 923 F.3d 1172, 1182 (9th Cir. 2019).  <u>See also</u>

27   <u>Kipp v. Davis</u>, <u>supra</u>.

28       [8] To the extent that petitioner's claim is based on a misapplication of state law, such is not
     reviewable here in that the Court of Appeal rejected any such assertion, and that stands as a state

9

1   theoretically possible that a state trial court, upon counsel's objection, would have rejected

2   propensity evidence based on the (theoretical) overwhelming nature of lower federal court law

3   despite a lack of authority directly from the Supreme Court.

4       The claims require the analysis of the Court of Appeal:

5   ### 3. *McKinney* and Federal Authorities

6       Defendant more than once states that he "recognizes our
Supreme Court has found section 1108 to be constitutional, but
7   presents this pure question of law to preserve it for further review."
Defendant cites *McKinney*, *supra*, 993 F.2d 1378 and other older
8   cases, in contending that admission of the section 1108 testimony
violated his due process and a fair trial rights. *McKinney* is often cited
9   in this context. However, as we have previously observed, a
"[d]efendant's reliance on *McKinney*—a case decided before
10  enactment of the federal rules allowing evidence of uncharged sexual
assaults and child molestation and the enactment of section 1108—
11  is misplaced. [Citation.] The application of *McKinney*'s holding in
the context of [uncharged sexual misconduct] evidence has been
12  repeatedly rejected. [Citations.] The Ninth Circuit and other federal
courts have long since upheld the constitutionality of the federal rules
13  allowing sexual misconduct evidence to establish propensity to
commit such crimes." (*People v. Holford* (2012) 203 Cal.App.4th
14  155, 183, fn. 19.)

15      Section 1108 was modeled after rule 413 of the Federal Rules
of Evidence (rule 413, 28 U.S.C.). [Fn. 12 omitted]. (*People v.
16  Falsetta* (1999) 21 Cal.4th 903, 912 (*Falsetta*).) The federal court
cases rejecting due process challenges to rules 413 and 414 [Fn. 13
17  omitted] are many and we have found no federal cases concluding
that these rules of evidence offend due process. Recently, in *United
18  States v. Schaffer* (2d Cir. 2017) 851 F.3d 166, the Second Circuit
noted that under rule 413, the prosecution "may use evidence of prior
19  sexual assaults precisely to show that a defendant has a pattern or
propensity for committing sexual assault." (*Schaffer*, at pp. 177-178,
20  fn. omitted.) The *Schaffer* court observed: "While we recognize that
Rule 413 represents an exception to the general 'ban against
21  propensity evidence,' we agree with every other court of appeals that
has addressed this issue and hold that, in light of the safeguards
22  provided by Rule 403,[Fn. 14 omitted] Rule 413 on its face does not
violate the Due Process Clause." (*Schaffer*, at p. 177, fns. omitted, &
23  fn. 56, citing *United States v. Mound* (8th Cir. 1998) 149 F.3d 799,
801, *United States v. Enjady* (10th Cir. 1998) 134 F.3d 1427, 1430-
24  1433 (*Enjady*), *United States v. LeMay* (9th Cir. 2001) 260 F.3d
1018, 1026-1027 (*LeMay*) & *United States v. Julian* (7th Cir. 2005)
25  427 F.3d 471, 487; *see also United States v. Castillo* (10th Cir. 1998)
140 F.3d 874, 880-881.)

26

27      In *McKinney*, a murder victim's throat was slit, and the

28  ───────────────────────
law determination. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

medical examiner testified the wounds could have been caused by almost any kind of knife. (*McKinney*, *supra*, 993 F.2d at p. 1381.) A specific murder weapon was never identified. (*Ibid*.) The prosecution introduced evidence that the defendant had a knife collection of which he was proud and that he scratched on his dormitory closet door with a knife, "Death is His." (*Id*. at p. 1382.) The Ninth Circuit concluded that this evidence was probative only of the defendant's character and its admission violated the prohibition against evidence of bad character. (*Id*. at pp. 1384-1385.) It further held that, because that prohibition is based on the community's sense of fair play and decency, the admission of the evidence violated due process. (*Ibid*.)

However, in *LeMay*, the Ninth Circuit rejected reliance on *McKinney* in a case involving evidence of uncharged acts of child molestation admitted under rule 414. (*LeMay*, *supra*, 260 F.3d at pp. 1026-1027.) The court noted that in *McKinney* it had held that propensity evidence "will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have. Potentially devastating evidence of little or no relevance would have to be excluded under Rule 403. Indeed, this is exactly what Rule 403 was designed to do. We therefore conclude that as long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional." (*LeMay*, at p. 1027.) In light of the *LeMay* court's rejection of *McKinney* in the context of the admissibility of prior acts of child molestation to show propensity, defendant's reliance on *McKinney* is clearly misplaced. [Fn. 15 omitted]. We expressly reject *McKinney* as grounds upon which to find that section 1108 is constitutionally invalid on its face and conclude that trial counsel's performance was not deficient for failure to rely upon it. (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [failure to object to the admission of evidence is not ineffective assistance where "there was no sound legal basis for objection"].)

California's decisional law concerning the facial constitutionality of section 1108 and the federal analogues are settled and have been settled for some time. We reject the contention as completely meritless, and thus we reject defendant's contention that his trial counsel provided constitutionally ineffective assistance of counsel.

ECF No. 36-1 at 30-33.

The standards for ineffective assistance of counsel are well set forth in <u>Cullen v. Pinholster</u>, 563 U.S. 170, 189-190 (2011):

There is no dispute that the clearly established federal law here is *Strickland v. Washington*. In *Strickland*, this Court made clear that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

11

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*., at 686, 104 S.Ct. 2052 (emphasis added). The Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*., at 689, 104 S.Ct. 2052.

Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *ibid*., the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id*., at 690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id*., at 688, 104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id*., at 690, 104 S.Ct. 2052.

The Court also required that defendants prove prejudice. *Id*., at 691–692, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*., at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid*. That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, *supra*, at 112, 131 S.Ct., at 791.

 Our review of the California Supreme Court's decision is thus "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1413, 173 L.Ed.2d 251 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam*)). We take a "highly deferential" look at counsel's performance, *Strickland*, *supra*, at 689, 104 S.Ct. 2052, through the "deferential lens of § 2254(d)," *Mirzayance*, *supra*, at 121, n. 2, 129 S.Ct., at 1419, n. 2. Pinholster must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death.

One cannot read the above California appellate court's discussion of federal law as anything but correct and reasonable. The fact that the Ninth Circuit has issues with propensity evidence in non-sexual misconduct cases does not permit this court to find that in a sexual misconduct case, an objection by trial counsel based on federal due process would have been overruled.  Even if *McKinney* is the better rule for all purposes, reasonable jurists can, and have, determined otherwise. An objection which would have been overruled, as indicated by the Court

1   of Appeal, cannot stand as a basis for ineffective assistance of counsel.  See Kimmelman v.

2   Morrison, 477 U.S. 365, 382 (1986) (petitioner must establish that a motion not made would have

3   had merit.)  The propensity evidence ineffective assistance claim should be denied.

4        With respect to CSAAS evidence the Court of Appeal found that California law permitted

5   such evidence, along with its conclusions that due process was not violated.[9] The undersigned

6   need not engage in an analysis of whether the appellate court decision was based on federal, as

7   opposed to only state law, as under any standard of review, a due process objection would fail.

8   The Ninth Circuit has upheld the use of this evidence against a due process attack in Brodit v.

9   Cambra, 350 F.3d 985, 991 (9th Cir. 2003). See also Otero v. Diaz, No. 2:19cv00381 MCE KJN

10  _____
          [9]

11            Dr. Anthony Urquiza testified as an expert for the prosecution
12        on the topic of CSAAS. CSAAS consists of five emotional behaviors
          that have been observed in children who have experienced sexual
13        abuse: (1) secrecy; (2) helplessness; (3) entrapment and
          accommodation; (4) delayed disclosure; and (5) retraction. (See
14        People v. Bowker (1988) 203 Cal.App.3d 385, 389 (Bowker).)

15            Urquiza testified that that CSAAS, established by Roland
16        Summit in 1983, serves the purpose of educating therapists who are
          treating children who have been sexually abused in an effort to teach
17        them "about the context in which abuse happens, what are the
          common characteristics, common behaviors, common things that
18        abused children -- sexually abused children do, and to dispel any
          misperceptions or myths that those therapists may have had about
19        sexual abuse." Urquiza testified that CSAAS "is an educational tool
          initially designed to educate therapists about common characteristics
20        of sexual abuse" and "'[i]t is not and should not be used as a
          diagnosis of any type.'" On cross-examination, Urquiza
21        acknowledged that CSAAS starts with the premise that the child has
          been sexually abused, and is used to better understand the victim.
          Urquiza testified that there are five components of CSAAS.

22  ECF No. 36-1 at 53.

23
24        According to the jury instruction regarding use of such testimony, the jury is instructed
    that it is not evidence that the defendant committed any of the crimes charged against him, but
25  only whether the conduct of a child "was  not inconsistent with the conduct of someone who has
    been molested, and in evaluating the believability of the person's testimony." Id. at 59.  There
26  might be some merit to petitioner's argument that the expert's testimony is to be construed, for
    practical purposes, that the  asserted child victim is to be believed no matter what problems there
27  might be with the child's testimony, prior statements, etc., i.e., there is always a reason why the
    problems are not consequential to the prosecution case, and no areas of problematic testimony
28  exist where the child might be disbelieved.

                                              13

1   P, 2020 WL 7406517 (E.D. Cal. Dec. 17, 2020).  If counsel had made a federal due process

2   objection in the trial court, it would have been overruled.

3        Again, an objection must be meritorious before it can be considered actionable as

4   ineffective assistance of counsel.  The claim with respect to ineffective assistance of counsel for

5   failing to object to CSAAS evidence should be denied.

6   *Conclusion*

7        Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

8   issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A

9   certificate of appealability may issue only "if the applicant has made a substantial showing of the

10  denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these

11  findings and recommendations, a substantial showing of the denial of a constitutional right has

12  not been made in this case.

13       Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court attach ECF No. 36-1

14  to these findings and recommendations as Appendix A.

15       IT IS FURTHER HEREBY RECOMMENDED that:

16       1.  Petitioner's writ for habeas corpus be DISMISSED due to all claims being either

17  procedurally defaulted, and/or without merit, and judgment entered in favor of respondent; and

18       2.  The District Court decline to issue a certificate of appealability.

19       These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

21  after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

24  ////

25  ////

26  ////

27  ////

28  ////

1   objections shall be filed and served within fourteen days after service of the objections.  The

2   parties are advised that failure to file objections within the specified time may waive the right to

3   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4   Dated: February 16, 2020

5                                                    <u>/s/ Gregory G. Hollows</u>
                                              UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX  A

# EXHIBIT A

Court of Appeal, Third Appellate District
Andrea K. Wallin-Rohmann, Clerk
Electronically FILED on 11/28/2018 by C. Doutherd, Deputy Clerk

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MALANJE PHEA,<br><br>        Defendant and Appellant. | C080488<br><br>(Super. Ct. No. 13F01371) |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge.  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I.B.-I.E.2., I.E.4., III., IV., V., VI., and VII. of the Discussion.

1

Defendant was found guilty of all counts in a 33-count information.  Thirty-one of the counts charged defendant with sex offenses against one of his daughters and two other victims, each of whom was 16 years old or younger at the time of the offenses.  In the other two counts defendant was convicted of furnishing a controlled substance to the daughter.  At trial, two additional victims testified to uncharged acts of child molestation and sexual misconduct pursuant to Evidence Code section 1108.[1]  The trial court sentenced defendant to 46 years four months in prison.

On appeal, defendant asserts that:  (1) the trial court abused its discretion in admitting the evidence of prior sex offenses pursuant to section 1108, and any forfeiture of that contention constituted ineffective assistance of counsel; (2) instructing the jury with CALCRIM No. 1191 allowed the jury to infer his guilt based on mere propensity proved by only a preponderance of the evidence, confusing and misleading the jurors on the burden of proof and conflicting with the circumstantial evidence instruction, and any forfeiture of these contentions constituted ineffective assistance of counsel; (3) the trial court abused its discretion in admitting expert witness evidence of child sexual abuse accommodation syndrome (CSAAS), and any forfeiture of that contention constituted ineffective assistance of counsel; (4) the trial court erred in instructing the jury with CALCRIM No. 1193 because that instruction permitted the jury to use the CSAAS evidence to evaluate the believability of the victims' testimony, reducing the prosecution's burden of proof; (5) he sustained prejudice as a result of cumulative trial error; and (6) the trial court failed to exercise its discretion, and abused that discretion, in imposing consecutive sentences on counts one and two.

In the published portion of this decision (Discussion parts I.A. & I.E.3.) we reject defendant's due process contentions and in doing so, we conclude that reliance upon

---

[1]  Further undesignated statutory references are to the Evidence Code.

*McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 (*McKinney*) is misplaced because that case has no application in the context of section 1108 evidence.  We also reject defendant's contention that CALCRIM No. 1191 concerning uncharged acts of sexual misconduct[2] and the circumstantial evidence instructions conflict and reduce the burden of proof.  (Part II. of the Discussion.)  Our high court's reasoning in cases involving a later version of the uncharged sexual misconduct instruction and instructions pertaining to section 1101, subdivision (b), compels rejection of defendant's argument.  Furthermore, the wording of CALCRIM No. 1191 makes it clear that the reasonable doubt standard applies to the charged offenses.

We vacate the sentences imposed on counts one and two and remand the matter for resentencing on those counts, at which the trial court shall choose whether to impose consecutive or concurrent sentences and articulate the reasons for its choices.  We also direct the trial court at resentencing to clearly impose a court operations assessment and a criminal conviction assessment on all 33 counts.  We otherwise affirm.

---

[2]  Now CALCRIM No. 1191A.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### The Prosecution's Case-in-chief

### J. Doe[3] (Counts One & Two)[4]

J. was 32 years old at the time of her trial testimony.  R., formerly defendant's wife, was J.'s cousin.

J. recalled a time when she was 14 years old when she visited defendant and R. in Sacramento and defendant took J. and P. to a park and gave them alcohol.  Defendant also made advances at both J. and P.  When it was time to leave the park, J. and P. did not want to go in the house with defendant so they slept in the car in the driveway.

There were also occasions when J. saw defendant in the Bay Area.  On one occasion, J. was at her grandmother's house in Richmond and defendant was there.  J. woke up and went into the living room where she saw defendant.  Defendant passed J. a letter in which he told her that he had a dream about her.  Later that day, defendant repeatedly called for J. at her grandmother's house, but J. told her grandmother to tell him that she was not there.  J. was scared, and she called P. and asked her to come over, which P. did.  Later, defendant came to the house and he and P. went to the store together.

On another occasion, J. was in the ninth grade and she was called into the office at school.  There, she found that there were flowers and balloons for her from defendant.  J.

-----

[3]  At trial, each of the victims was referred to by the last name of Doe.  To further protect the personal privacy interests of the victims and other people involved, we refer to them by the initial of their first name, except where they share the same first initial with another witness.  We realize that this may present some difficulty to the reader, but on balance, find that their privacy interests warrant this treatment.  (Cal. Rules of Court, rule 8.90(b).)

[4]  The information alleged sexual penetration and oral copulation of J., a victim under 16 years of age (Pen. Code, § 289, subd. (i)—count one; § 288a, subd. (b)(2)—count two).

threw them away.  When J. got home later that day, her mother asked her where the flowers and balloons were.  When J. asked her mother how she knew about them, J.'s mother responded that defendant "said he wanted to do something nice for you because you were feeling down."  (Italics omitted.)

On another occasion, still when J. was 14, she visited R. and defendant for the summer.  One day, R. went to work and J. took a shower.  After taking a shower, J., wearing only a towel, went into a bedroom and closed the door.  Defendant entered the room, started touching J., and tried to take her towel off.  J. told defendant to stop, but defendant reassured her that he was not going to hurt her.  Defendant eventually got J.'s towel off, laid her on the bed, touched her breasts, opened her legs, caressed her vagina, and performed oral sex on her.  Defendant also inserted two fingers in J.'s vagina.  He also attempted to place his penis in J.'s vagina.  J. said no.  Defendant's penis pushed against J.'s vagina "but it wouldn't go and then [J.] told [defendant] that [she] wasn't ready and then he stopped."  Defendant then left the room.

J. acknowledged that she did not disclose the incident to adults or to law enforcement.  She felt like it was a difficult situation, particularly because defendant and R., who was J.'s cousin, had been together so long.  J. felt guilty.  J. eventually decided to disclose what had happened in 2012, after she learned that Ja., defendant's daughter, had reported incidents to law enforcement.  After that, J. spoke to R., told her what had happened, and R. told J. that she should contact law enforcement.

**L. Doe (Counts Three & Four)**[5]

L. was 25 years old at the time of trial.  She testified that defendant dated her sister, S.  Defendant was still married, but he had told S. that he and his wife were separated.

L. visited S. in August 2005.  While they were all in a car together, defendant said something to S. about a threesome.  Defendant asked L. if she would ever have a threesome with him and S.  Later in the day, at S.'s apartment, defendant offered L., who was 15 years old at the time, a Long Island Iced Tea.  Defendant told L. multiple times that she was sexy.  Looking through a catalog, defendant pointed out some lingerie and told L. that she would look sexy in it.  L. was feeling uncomfortable, and she just kept brushing defendant off.

L. stayed that night in S.'s apartment.  Defendant touched L. inappropriately on more than one occasion that night.  On the first occasion, L. was sitting on the couch under a blanket playing with S.'s nine- or ten-month-old son.[6]  Defendant picked up the baby and, when he did so, he picked up the blanket as well.  As defendant lifted the baby with one hand, he rubbed L.'s vagina over her pajama bottoms with the other hand.

Later, defendant and S. were playing around and locking each other out of the apartment.  At one point, when he locked S. out, defendant approached L. on the couch, rubbed her vaginal area over her clothing for about a minute, and tried to kiss her.  Defendant said to L., " 'We're doing this.  We're going to do this.' "  He then went to unlock the door for S.

---

[5]  The information alleged two counts of lewd or lascivious acts on L., a child 15 years of age, defendant being at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1); counts three & four).

[6]  L. testified that, at the time, defendant thought S.'s son was his son.  It turned out the baby was not defendant's child.

Defendant left the apartment, but, after he left, he called L. more than three times and sent her text messages.  L. did not answer the calls.  In the text messages, defendant told L., " 'We're fucking tonight,' " and " 'Don't be scared.' "

By the time defendant returned to the apartment, in the middle of the night or in the early morning, L. was asleep on the couch.  Defendant knocked, but lightly enough so that S. would not hear.  L. did not do anything, thinking that defendant might just go away.  Defendant knocked harder, and then called S., who let him in.  S. and defendant went into S.'s room, but defendant returned to the living room an hour or two later, after S. went to sleep.  L. was on the couch, pretending to be asleep.  Defendant approached the couch and touched L. under the blanket.  Defendant pulled L.'s pajama bottoms down, tugged on L.'s underwear, ripping them, and put two fingers in her vagina.  Defendant moved his fingers in and out.  L. just lay there, not knowing what to do.  L. told defendant not to touch her, but she acknowledged at trial that she did not know if she said it loudly enough, "or if it was in a joking way.  I wasn't really aggressive telling him to stop."  She felt embarrassed.  After a few minutes, S. came into the room, and defendant dove onto the floor and pretended that he had just been lying there.  Defendant then got up and went to the patio with S., had a conversation, and then went into the bathroom.  Defendant left the apartment and S. went back to sleep.  L. just lay there, not knowing what to do.

The next morning, L. called her mother to pick her up and told her what had happened.  L. and her mother went to her mother's house, where her mother called the police.  Deputy Sheriff Gustavus Youngberg came to the house and took a statement from L.  L. told Youngberg that defendant touched her vagina area three times.  L. showed the deputy her phone with the text messages and call log.  There were five missed calls on the phone.  Defendant had texted L., "ur fucking tonite.  Rite me!  Don't be scared!"  A second text read, "ur fucking tonite.  Write me!  She is going to sleep.

7

Call."  A third text message was the same as the first text message.  The last text message said, "I'm coming."

L.'s mother then took L. for a medical examination.  She saw Sheridan Miyamoto, a forensic nurse practitioner who worked at the Child and Adolescent Abuse Resource and Evaluation Center at U.C. Davis.[7]  Miyamoto saw children brought in due to concerns of physical and sexual abuse or neglect.  Miyamoto performed an examination of L. on August 17, 2005.  As she began the examination, Miyamoto noticed that L.'s underwear was torn.  L. said that her sister's boyfriend had put his hand in her underwear, and her underwear tore.  During the genital examination, an area of L.'s left labia majora "fluoresced," indicating the possible presence of a substance that could contain DNA.  After the examination, Miyamoto concluded that the results were consistent with L.'s description of the alleged assault.  Miyamoto noted that, in cases of digital penetration, it is "not at all uncommon" for there to be no physical injuries.  She further noted that, based on a substance fluorescing, "not knowing what those are, I also mark as something that is -- potentially contributes and would be consistent."

Miyamoto collected evidence via swab from the area that fluoresced, labeled it, and placed it in the crime kit.  Ann Murphy, a criminalist at the Sacramento County Laboratory of Forensic Services, compared the foreign material swab from L.'s crime kit, which was a partial profile, with a reference sample from defendant and found that the DNA profiles were consistent.  The likelihood of a random individual's DNA profile matching the partial profile Murphy analyzed was one in 250 million in the African-American population, one in three billion in the Caucasian population, and one in 15 billion in the Hispanic population.

---

[7] Miyamoto was unavailable at the time of trial.  Her video-recorded testimony from a prior proceeding was played for the jury.

When Detective Jason Jacobo of the Elk Grove Police Department contacted L. in 2012 about the investigation, she did not want to be involved.  Ultimately, L. did talk to two female criminal investigators from the district attorney's office.

### Ja. Doe (Counts Five through Thirty-Three)[8]

Ja. was defendant's daughter.  She was 23 years old when she testified at trial.

When Ja. was nine years old, defendant began to come into her room, which she shared with her younger sister D., and kiss them both on the mouth.  Ja. testified that defendant would sometimes use his tongue when he kissed her on the mouth and his kisses could last five minutes.  Defendant would also touch Ja. on her vaginal area, under her clothing, with his hand.  Sometimes defendant would carry Ja. into his room when R. was not there and rub lotion on her without her clothes on.  He would apply lotion to Ja.'s arms, legs, and then "he would move up more in between [her] legs with [her] vagina area."  Defendant would "use his two fingers and he would rub along the vagina area slow."  He would also rub Ja.'s breasts.  Ja. estimated that this occurred 20 times.  The last time defendant did this, Ja. ran to her room and locked the door.

On one occasion, still when Ja. was nine, defendant was playing with Ja. and D. and defendant's penis came out of his boxer shorts.  He did not put it back in, but instead continued to play with the girls.

One day, still when Ja. was nine years old, R. called Ja. where she was staying "in the Bay Area at [her] nana['s] house," and asked Ja. if defendant ever touched her in a " 'wrong way.' "  Ja. told R. that he did.  When R. confronted defendant, he told Ja. to

---

[8]  Regarding Ja., the information alleged 11 counts of lewd or lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a); counts five through fifteen); 16 counts of lewd or lascivious acts on a child of 14 years of age (counts sixteen through twenty-three) and 15 years of age (counts twenty-four through thirty-one), defendant being at least 10 years older than the child (Pen. Code, § 288, subd. (c)(1)); and two counts of furnishing a controlled substance (cocaine & ecstasy) to a minor (Health & Saf. Code, §§ 11353 & 11380, subd. (a); counts thirty-two & thirty-three).

stop lying.  He also suggested that Ja. had been dreaming.  Ja. was scared and feared she was going to get in trouble.  She also did not want her parents to fight.  Ja. was brought to "a children's place where [she] had to talk to somebody," and she told that person "that it didn't happen . . . ."  On cross-examination, Ja. testified that she remembered telling a social worker that defendant never touched her inappropriately, but testified that she did so only because she was scared.  She did not want her parents to be mad at her.

The next time Ja. remembered something sexual happening with defendant was when she was 13 years old.  She testified that defendant "took [her] virginity from [her]."  R. was at work and defendant told Ja. to come to the room where he was.  Defendant had video surveillance cameras throughout the home, and defendant was looking at a monitor to see if anyone was coming.  Defendant closed the door, pulled down Ja.'s pants, and tried to put his finger in her "private area," but it would not fit. Defendant said, " 'Let me see something right quick.  Let me check something out.' "  Defendant told Ja. to lie down, which she did, and defendant pulled out his penis.  Defendant inserted his penis inside of Ja., and she told him that it hurt.  Defendant "kept going and going with it."  While he was doing it, defendant kept looking at the video monitor.  Defendant told Ja., " 'Just for a few more seconds.  Just give me a second, for a few more seconds.' "  Defendant then ejaculated onto his hand.  Ja. estimated that the incident took 15 minutes.  When it was over, Ja. was bleeding.  She pulled up her pants and ran upstairs, wiped herself, and saw that there was "a lot of blood."  She then heard defendant say, " 'Come on.  Let's go.  Let's go pick up your mom.' "  When they picked R. up, R. immediately asked Ja. what was wrong.  Ja. could see defendant looking at her in the rearview mirror.  Ja. "just turned back around and looked out the window, continued to look out the window and didn't say anything after that."

On another occasion, when Ja. was still 13 years old, she awoke to defendant coming into the room she shared with D.  Ja. saw defendant put a DVD on the television.  Ja. went back to sleep.  When she woke up, she saw that there was pornography playing

on the television.  By that time, defendant was no longer in the room.  Ja. turned the television off and went back to sleep.  Ja. woke up again later, saw that defendant was sitting on the edge of her bed, and saw the pornography back on the television. Defendant was rubbing Ja.'s vagina area under her clothing with his hand.  Ja. got up, ran out of the room, and ran into R.'s room.  R. said, " '[Ja.], what are you doing in here?  Go to bed.' "  Ja. did not tell R. what had happened, and instead went back to her room. Defendant had left her room.  The next morning, Ja. told R. what had happened, that she did not like the way defendant touched her, and that she felt uncomfortable.  R. again confronted defendant with what Ja. had said.  Defendant claimed he did not know what she was talking about, and again suggested that Ja. had been dreaming.  Nothing came of this disclosure either.

Ja. testified that, when she was 13, defendant had her give him oral sex, he gave her oral sex, and he had vaginal and anal intercourse with her.  Defendant also penetrated Ja.'s vagina using his fingers and using other objects, including what Ja. believed to be a massager that was kept in her parents' dresser drawer.  He would also kiss her and touch her breasts.  Defendant would ejaculate on various places on Ja.'s body.

Using a Sony camera, defendant would take photographs and videos of Ja. while she was naked.  He would record these images of her vagina and her breasts.  Ja. testified: "He would tell me to open my legs, put my legs back, or he would tell me to put my hands down at my private, my vagina area, and he would tell me to open up my vagina area with my hands so he can see the inside of my vagina."  Defendant would also tell Ja. to play with herself for the video, and to go into the bathroom and record herself. Sometimes she would protest, but defendant would tell her that she could choose between recording herself or having sex, and she would choose recording herself.  Defendant would also record sex acts he engaged in with Ja.

Defendant would text Ja. and tell her things like, " 'ten minutes come in the room,' " or he would tell Ja.'s siblings to go to bed and tell Ja. to come back downstairs

in 20 minutes.  When they were alone, defendant would tell Ja. to "make him hard," by which he meant that she should give him oral sex, he would tell her to lie down and tell her, " 'We're going to do this,' " or he would tell her, " 'Suck me up for a little bit.' "  It got to the point that Ja. knew what was going to happen when defendant told Ja. to meet him someplace.  Ja. would just take her clothes off, knowing what was about to happen.

If Ja. told defendant she did not want to do something, he would get mad, take things away from her, tell her she could not go out, or "just have attitudes if [she] didn't do it."  Ja. testified that defendant would give her gifts or tell her that, if she let him have sex or have oral sex, he would let her go to a friend's house or go out and do something.  The gifts included necklaces, rings, and new phones.  However, if Ja. did not do as defendant wanted, he would take the items away.  When Ja. would come home after having her hair done, defendant would say, " 'You want to get on tonight?' " He would also use sex as a "reward" on her birthday and other special occasions.  Defendant told Ja. that "all fathers do this with their daughters.  That's just their father-daughter relationship.  It's just how things go."  He also told her that he had "done stuff to [Ja.'s] cousin and [her] brother," and " 'Yeah, I did that to them.  It's normal, so then it should be okay for me to do this to you.' "

Defendant would also use sex as a punishment.  On one occasion, defendant saw Ja. talking to a boy, which he did not like, and he was mean to Ja. all day.  That night, while everyone else in the house was asleep, defendant had sex with Ja., during which he slapped her face and asked if she learned her lesson, if she was going to "do that again," and if she was sorry.  On another occasion, when she did not let defendant have oral sex with her, he dropped her off at a friend's house, but immediately retrieved her and told her that he would not take her back unless she let him perform oral sex on her.  Ja. ran upstairs crying, and defendant choked her.  R. heard the commotion and asked what was going on.  When Ja. said defendant had choked her, defendant, again, said she was lying.

R. told Ja. that if she was talking back to defendant, she should stop.  Later, defendant took Ja. to S.'s house, and, while S. was not there, he had sex with Ja.

Defendant would also tell Ja. that no one else would make her feel the way he did, and that he wanted to be the only person in her life making her feel the way he did.

Ja. also remembered an incident when she was 13 when defendant first gave her ecstasy.  Defendant would give her marijuana, alcohol, cocaine, and ecstasy.  Ja. testified, of these substances:  "I felt -- my body was tired.  At times I would do it just so I wouldn't feel the pain just so I wouldn't feel nothing, and I would be so numb to where I'm not even in my body.  I'm just laying there and just don't know, like, what's about to happen.  Just blacking out.  Just dropping to my knees and just doped up."

Ja. would tell defendant that she was going to tell R., to which he responded, " 'Well, you tell her, then she's not going to believe you,' or 'She's going to beat you up,' or 'You're going to get in trouble for it.' "  Ja. wanted to tell R. "[a]ll the time," but she did not.  She felt tired, she was losing weight, her hair was falling out, and she was not functioning in school.  One day she looked in the mirror and she saw "this doped-up person that I would see on the streets somewhere or say, 'Oh, my God, look at that person.  What happened to them?  Why are they like that?' "  She remembered one occasion when she went upstairs to tell R. what was happening.  She went up the stairs towards the room where R. was, and she heard R. having a conversation with someone.  The subject of the conversation was molestation in families, and Ja. overheard R. say that she prayed nothing would happen to her family and her daughter.  Ja. "just stopped in front of the door, and . . . went back downstairs."

Ja. testified that sexual activity occurred every night.  However, she also testified that she thought the sexual activity occurred "more than 30 times" each year.  She responded affirmatively when the prosecutor asked whether the forms of sexual activity she described, including performing oral sex, receiving oral sex, defendant's digital penetration of her vagina, and vaginal intercourse, occurred at least twice each year

13

between the time she was 13 and when she was 17.  She also testified that defendant provided her with cocaine and ecstasy each year when she was 15, 16, and 17. Defendant's sexual abuse of Ja. continued until she was 17 years old.

When Ja. was 17, on Christmas Eve, R. was on the phone, and, while she was on the phone, R. said something like, " 'If you don't tell what you done or somebody done to you, that's bad.  You're going to go to hell,' " or "if you don't tell what happened to you, or if anybody doing anything to you, you're going to go to hell, you're going to burn up." Ja. thought to herself that she refused to go to hell because of defendant.  She felt her body getting hot, and she went to the bathroom.  R. followed Ja. to the bathroom and asked what was wrong.  Ja. told R. that defendant was having sex with her.

Ja. decided to go to the police.  R. told Ja., " 'If this is really what you want to do, then I'm here for you.' "  However, defendant's mother, brother, and sister told Ja. not to tell anyone, and that defendant would be killed in prison.

Ja. went to the police.  As Ja. got out of the car, defendant called her and said: " 'Don't tell on me.  Don't say anything.  Tell them that you had a boyfriend that you were with,' or . . . 'Tell them that you were, again, dreaming and you thought that was me and it wasn't me and whatever.' "  Ja. got scared, confused, and did not know what to say.  She still wanted to protect defendant because, despite everything he had done, he was her father.  Ja. "didn't go through with it."  She told the detective that nothing happened.  Again, on cross-examination, Ja. testified that she did not say anything because she was scared.  However, defendant's sexual abuse of Ja. ended, and R. and the kids eventually lived apart from him.  When she turned 20 years old, Ja. "finally had the courage and the strength to go tell."

### P. Doe (Section 1108 Witness)

P., J.'s cousin, testified pursuant to section 1108.  She was 32 years old at the time of trial.

P. testified that, when she was 13 or 14 years old, she went to J.'s grandmother's house because J. called her and asked her to come over.  P. went to the store with defendant, defendant asked for her phone number, and P. gave it to him.

Some time later, perhaps months later, defendant called P. and suggested that they get together.  Defendant suggested that he pick P. up on her way to school.  On one occasion, defendant picked P. up and took her to a house in North Richmond.  Defendant took P. into a room "and was kissing and stuff like that."  Defendant also tried to put his fingers in P.'s vagina by unzipping her pants and putting his hand down her pants, and he may have touched her breasts.  Defendant tried to take P.'s pants down, but he was not able to do so.  They remained at the house for approximately two hours, and defendant then took P. to school.

On another occasion, defendant took P. to an abandoned house in Richmond.  He took her into a room and kissed and touched her.

On yet another occasion, when P. was 13, she visited J. and R.  P. wanted to take a shower, but she was holding D., who was a baby at the time, attempting to put D. to sleep.  P. turned on the water, but D. was crying, so P. gave D. to J. and went back to the bathroom to shower.  When she got back to the bathroom, she found defendant in the shower.  P. testified that she did not remember what happened when she opened the shower curtain, but then testified that she remembered "us kissing and him sucking on my breasts and then after awhile, D. was still crying so I was like, I need to go and get your baby because she's still crying."  Defendant told P. not to leave.  P. told defendant that she would just put D. to sleep and come back, but she did not feel comfortable and so she did not return.  Asked why she did not feel comfortable, P. responded:  "it was becoming too much.  Like I wasn't, like, expecting him to be naked in the bathroom and all that."  P. admitted that she was "kind of okay with what had happened up to that point," but did not want things to go farther.

P. also remembered the time, around the same time or perhaps a year later, that defendant brought her and J. to the park and gave them alcohol.  According to P.'s recollection, she and defendant came back to the house while J. stayed in the park, and P. went to the bathroom.  When P. got out of the bathroom, defendant pulled her into the garage, placed a piece of cardboard on the floor, laid P. down on it, and, with both of their pants down, attempted to insert his penis in P.'s vagina.  However, it would not go in.  P. testified that she was trying to keep her legs closed and told defendant to stop and that he was hurting her.  R. was in the house at the time.  After this experience, P. attempted to distance herself from defendant and stopped coming around.

P. testified that she did not tell any adults what had happened for a long time because she was ashamed and she felt as though she "somewhat led it on."  After P. learned that Ja. had come forward, P. decided she wanted to cooperate.  Asked again why she did not come forward earlier, P. responded:  "I don't know.  That's something I got to live with for the rest of my life.  I should of came forward but I just kind of didn't want to deal with it, really.  I mean I wanted to tell R.; but we didn't know how to tell her.  Like, how do you go tell somebody that they married to -- that -- that they are touching and kissing and feeling and all that stuff?  Like, how do you tell somebody that?"

**Ra. Doe (Section 1108 Witness)**

Ra. testified pursuant to section 1108.  She was 27 years old at the time she testified at trial.

Defendant was Ra.'s uncle.  She was uncooperative at trial.  Ra. testified that she did not "remember when [she] was 14," and that she did not "remember anything."  She repeatedly testified, "I don't remember," "I don't remember anything," and "I don't remember nothing."  However, she acknowledged that she had told Detective Jacobo that defendant touched her in a sexual way when she was 14 years old, and that she made similar statements in preliminary hearing testimony.  She testified that Jacobo "put words in [her] mouth."  She denied that defendant raped her, and then testified that he did not do

16

anything.  When the prosecutor asked whether she told Jacobo that defendant touched her vagina and her breasts under her clothes, Ra. responded, "He told me that's what his wife, R., told him that.  He kept asking me questions, and I was telling him no; but he said that's what they said and I was scared so I don't know what to say."  When asked if she made a similar statement at the preliminary hearing, Ra. responded, "That you guys was asking me, yeah.  I said yeah, because I don't know what to say here.  I don't like being in this predicament."  Ra. testified, "I don't want to cooperate."  Ra. also testified that she did not recall defendant giving her a pill that made her feel blurry and sleepy.

The prosecutor played for the jury recordings of interviews between Detective Jacobo, another detective, and Ra.  When first contacted, she indicated she did not want to get involved.  Ultimately, Ra. told Jacobo that she was 14 years old when "that occurred" between her and defendant at his house in Elk Grove.  Ra. told Jacobo that defendant told her to go to the bed, and he would come into the room an hour later.  Ra. told Jacobo that defendant did not have sex with her, but he did touch her on her vagina and on her breasts.  Defendant had Ra.'s "pants down a little bit," and, when he touched her breasts, he did so under Ra.'s shirt.  He would touch her, leave the room, come back, and touch her again.  This pattern repeated "[l]ike three times."  Ra. told defendant to stop and he responded, " 'I can't,' " but then he stopped.  Ra. also told Jacobo that defendant gave her some type of pill that made her feel "blurry" and "sleepy."  Weeks later, defendant apologized to Ra. and asked her not to tell on him.  Three months after the incident, Ra. told her mother what had happened, and Ra. never talked to defendant again.  Ra. also told Jacobo that she told R. about it.  R. tried to fight her, but R. later changed her attitude.  During the interview, Ra. said she did not want to come to court.

Ra. also denied at trial telling Leslie Zapata, a criminal investigator for the district attorney's office, that her grandmother, her mother, and her uncle called her and pressured her not to testify at the preliminary hearing.  She testified that she did not recall telling Zapata that family members had threatened to come to the preliminary hearing to

17

intimidate her.  She also did not remember telling Zapata that her mother and grandmother told Ra. that they believed her, but that she should have kept her mouth shut and not spoken with police.

Zapata testified that she picked up Ra., an "uncooperative witness," to transport her to the preliminary hearing.  Zapata stayed with Ra. throughout the day.  According to Zapata, Ra. was very nervous and reluctant.  After the lunch break, Ra. vomited in the restroom.  Zapata testified that Ra. stated that she was receiving phone calls from her mother, her grandmother, and her uncles threatening to attend the preliminary hearing to intimidate her.  Zapata also testified that Ra. stated that her mother and her grandmother told her that they believed her, but that she should have kept her mouth shut and not talked with the police.  Zapata testified that, after the preliminary hearing, she and her partner were walking with Ra. out of the courthouse and towards the district attorney's office when Ra. said she saw her uncles walking towards them.

### Defense Evidence

Detective Jacobo testified that he participated in a search of defendant's home.  Defendant cooperated with the search.  Jacobo testified that there was no relevant evidence found on any of the electronics seized in the search.

R. testified that she and defendant were married for approximately 16 years.  R. testified that defendant was manipulative and "probably cheated on me the whole relationship."  R. remembered at one point hearing that Ra. had claimed that defendant had done something inappropriate with her.  This prompted R. to call Ja., who was nine years old at the time and who was staying at R.'s grandmother's house, and ask Ja. if defendant had done anything to her.  At first, Ja. said no.  As the conversation continued, Ja. said she did not know or understand, and then she started crying.  Then Ja. told R. that defendant did touch her.  R. went to the Bay Area to pick Ja. up, and then she called the police.  R. took Ja. somewhere to talk to someone, and Ja. told the person she spoke with that it had not happened.  R. testified that defendant convinced her that it had not

18

happened.  She testified:  "I think it was still in the back of my mind, but I don't think I wanted to believe that that happened."  R. acknowledged that she continued living with defendant, and continued leaving the children with him.

R. remembered an occasion when defendant and the children picked her up at work, and it seemed like something was wrong with Ja.  Ja. was very quiet and R. asked her if everything was okay.  Ja. told R. that nothing was wrong.

R. also remembered when, on Christmas Eve in 2009, Ja. told her that defendant had been molesting her.  R. called the police, and, later, took Ja. to the police station.  Ja. went into a room with a detective.  Afterward, Ja. did not tell R. anything about what she told the detective.

R. testified that she moved out with Ja. and D., but acknowledged that, sometime later, she moved back in with defendant.  She testified that she did not have anywhere else to go.  According to R., moving back in with defendant was supposed to be a temporary arrangement.  They ended up living with defendant for approximately one year.  During this time, R. and defendant were essentially roommates, and they slept in different rooms.

R. recalled hearing a rumor that defendant was having sex with J.  By this time, R. was not with defendant, "so it really didn't matter."  However, R. went to talk to J. about it, but "it just kind of went out of control," and after that, R. and J. did not talk.  At some point, however, J. told R. about an incident that happened with defendant when J. was younger.

Defendant testified.  He claimed that none of the accusations made by Ja., J., P., L., and Ra. were true.

On direct examination, defense counsel asked defendant if he recalled a time in 2001 when R. alleged that defendant had molested Ja. and defendant responded that he did remember her making the accusation.  Defense counsel then asked if something had happened between defendant and Ja.  Defendant testified that Ja. had asked if she could

19

go to the park and take D. with her, and defendant agreed.  However, later, he looked toward the park and saw D. but did not see Ja.  Defendant went to the park, where he found Ja. in the bushes with a boy.  Defendant testified that Ja. got in trouble for that incident, suggesting that this was a motive for fabricating an allegation of abuse.

A couple of days later, defendant was in the bathroom shaving when Ja. came in to take a shower.  Ja. said, " 'Look, Dad,' " and defendant looked over at her.  Ja. was pulling on her pubic hair.  On cross-examination, defendant stated that he had "ended up pulling, see what she was talking about.  It was pubic hair."  Defendant testified that, after that, he and R. got in a big fight, and R. went to the Bay Area.  Then defendant received a call from a detective asking about whether defendant touched his daughter and he said no.  Defendant called Ja. while the detective was still on the line, and, without disclosing that the detective was on the line, asked Ja. where he put lotion on her when he applied it.  Defendant asked Ja. if he touched her anywhere other than her arms and legs, and if he touched her "anywhere when you use the bathroom at," and she said no.  Defendant testified that the detective told him that the case would be closed.  This all occurred when Ja. was nine years old.  On cross-examination, defendant confirmed that he was indeed claiming that he, a suspect in the case, was permitted by the detective to make this surreptitious three-way call to his nine-year-old daughter.  However, after reviewing the 2001 report of that investigation, defendant acknowledged that he did not see any reference to this three-way call in the report.

Asked if he ever talked to R. about why she called the police, defendant responded:  "No.  She always say things, do things to me knowing that it -- she knew what to do to me.  She now [*sic*] how I am.  She knew how to get back at me everything.  At that time I had nowhere to go.  I was the one had nowhere to go.  She was the one with the job and all that.  At that time she had -- it was her house so I couldn't just leave.  I had nowhere to go."

Defendant testified that he had a history of cheating.  Defendant began seeing S. in 2003.  Defendant recalled that, in 2005, L. said that he touched her.  Defendant recalled one occasion when L. was at S.'s house and was holding the baby.  Defendant picked up the baby, gave him a kiss, and set him back down with L.  The next day, S. called defendant and told him that L. was saying that defendant touched her.  Defendant testified that he did not touch L. inappropriately.

Asked if something happened prior to Christmas Eve 2009 when R. accused him of molesting Ja., defendant testified that he had caught Ja. lying to him about a male friend that she was seeing.  Defendant told R. about it and Ja. got in trouble.  Also, defendant testified that, on another occasion around that time, he was having sex with a woman at their home.  He heard Ja. yelling, and Ja. came downstairs "to tackle the lady." Defendant told Ja. to go back upstairs, and he took the woman home.  Ja. told R. about the incident.

On the car ride back from the Bay Area following the Christmas Eve visit, R. again accused defendant of molesting Ja.  Defendant was angry and he and R. argued. When they got home, defendant got out of the car, expecting R. to follow and that they would talk more in the house.  However, R. "took off in the car."

On cross-examination, defendant testified that, when he was interviewed by police, he told the detective that R. must have fabricated the allegations because he had moved some of her possessions out of the house, and that she was mad at him because he was "surviving without her" and he did not want her back.  Defendant further acknowledged that, when the detective told defendant that it was Ja. making the allegations, he shifted his blame to Ja., stating that she had a "daughter-father crush" on him.  However, he then testified that he did not believe Ja. was to blame for anything.

Defendant next saw R. and the kids on New Year's.  At that time, they all moved back in with him.  However, the house was going into foreclosure, R. got an apartment, and she and the children moved out.  Defendant moved into a new place, and, after a

while, R. and the kids moved back in with him.  R. lived with defendant until the end of 2010, when she moved to another apartment.  The kids split time living with defendant and R.

Defendant testified that, in 2012, he and R. had various conflicts with each other.  One of these conflicts revolved around financial assistance.  Defendant received food stamps and "Section 8" housing subsidies (42 U.S.C.S. § 1437f; Welf. & Inst. Code, § 16517, subd. (c)).  The amount defendant received in benefits was increased over what he would receive personally because Ja., D., and their son were living with defendant.  When Ja. got pregnant, R. "used [Ja.'s] information to get an apartment," which subjected defendant to scrutiny over his section 8 housing claims.  Defendant underwent an interview, and he immediately removed all of the children from his section 8 housing claims.  Their son went into the military, and Ja. and D. went to live with R.  Defendant also took D.'s name off of his food stamps account, which made R. angry and she removed defendant from her medical benefits.  Defendant knew that R., Ja., and D. were receiving benefits, and that they should not also be receiving benefits on his accounts.  Defendant did not want to get into trouble with the government for committing fraud.

After Ja. became pregnant, her college grades began to suffer.  Defendant confronted Ja. about the issue and Ja. got upset with defendant.

At some point, defendant began living with S.G., his new girlfriend.  This was upsetting to R. because defendant had taken the children off of his section 8 housing and yet "then I let another lady come in with her kid."  In July 2012, defendant was with Ja.'s boyfriend, when defendant was arrested for driving under the influence.  Defendant gave his cell phone to the boyfriend to take home and give to S.G.  However, somehow Ja. obtained the phone.  Defendant testified that there were photos and videos on the phone, including photos and videos of naked women, which showed that he had been seeing other women.  Defendant believed that Ja. went through his phone because, at some point, she answered his phone.

Defendant acknowledged having heard a rumor that he was seeing J.  While defendant admitted to being flirtatious with J., he denied that he had an affair with her.

In October 2012, police showed up at defendant's home and searched his entire house.  The police seized all of defendant's electronics, and defendant provided police with all of his passwords.  Defendant went with the police and was interviewed by Jacobo for approximately one hour.  After the interview, defendant went home.

Defendant testified on cross-examination that R. brainwashed "all three of [defendant's] kids."  He testified that he believed that everybody, "Whoever was in this case," including S.G., was part of a conspiracy against him.  Defendant also testified on cross-examination that he believed that R. made multiple false allegations of child molestation against him because of the fights he had with her.  When questioned by the prosecutor why he would continue to stay in the household with a woman who continuously accused him of molesting his children, despite the risk of being incarcerated, defendant responded that he stayed for his children.  Defendant also testified that R. sent him threatening text messages.  When the prosecutor asked about the seizure and forensic analysis of defendant's five phones and whether defendant was able to find those threatening text messages, defendant responded, "I don't trust what the forensic people did.  And I think that they didn't give me my -- all my texts . . . ."  Defendant asserted that, in viewing the forensic extractions from his cell phones, he saw that the dates had been changed and text messages and logged calls were missing.  The prosecutor asked defendant if the police, too, were in on the conspiracy, to which defendant responded, "Ask them.  I don't know.  I think you in on the conspiracy.  I'm sorry."

**Verdict and Sentencing**

The jury found defendant guilty on all 33 counts, and further found true the allegations that counts one through thirty-one were timely filed.

The trial court sentenced defendant to an aggregate determinate term of 46 years four months, calculated as follows:  the upper term of nine years on count thirty-two; consecutive two years (one-third the midterm) on count thirty-three; consecutive eight months (one-third the midterm) on counts one through four; consecutive two years (one-third the midterm) on counts five through fifteen; and consecutive eight months (one-third the midterm) on counts sixteen through thirty-one.  In choosing the upper term on count thirty-two, furnishing ecstasy to Ja., the trial court stated that the evidence demonstrated that there were multiple instances of that crime having been committed, and that it believed that defendant should be incarcerated for the maximum term permitted by law.

## DISCUSSION

### I.    Admission of Section 1108 Evidence

#### A.  Additional Background

In her written in limine motions, the prosecutor sought the admission of evidence of uncharged sexual offenses committed against P. and Ra. pursuant to section 1108.[9] The prosecutor asserted that, under section 1108, such evidence is admissible to prove that defendant committed the charged sexual offenses.  The prosecution acknowledged that evidence otherwise admissible pursuant to section 1108 is subject to a section 352 balancing analysis.  The trial court allowed the evidence concerning both P. and Ra.

#### B.  Defendant's Contentions

Defendant asserts that the trial court abused its discretion in admitting evidence of prior sexual offenses pursuant to section 1108.  Defendant asserts that section 1108 is unconstitutional on its face and as applied because it violates due process.  Defendant does acknowledge that the California Supreme Court has found section 1108 to be

---

[9] In the alternative, the prosecutor sought admission of the evidence pursuant to section 1101, subdivision (b), a request we need not address here.

constitutional, and it has rejected due process challenges to that section, but he
nonetheless asserts his argument "to preserve . . . for further review" his claim that
section 1108 violates federal due process standards.  Regarding his as-applied challenge,
defendant asserts that this evidence, which needed only to be established by a
preponderance of the evidence as stated in CALCRIM No. 1191, weakened the burden of
proof and resulted in his conviction based on proof less than proof beyond a reasonable
doubt.  Defendant further asserts that this evidence should not have been admitted on
section 352 grounds.  Under a separate heading, defendant asserts that his forfeiture of
this issue in the trial court was the result of ineffective assistance of counsel.  Even if the
evidence had been properly admissible pursuant to section 1108, defendant asserts that,
had defense counsel objected, the evidence would have been excluded pursuant to 352
because its prejudicial effect substantially outweighed any probative value.

### C.  Section 1108 and Applicable Principles of Law

"Character evidence, sometimes described as evidence of a propensity or
disposition to engage in a type of conduct, is generally inadmissible to prove a person's
conduct on a specified occasion."  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159
(*Villatoro*), citing § 1101, subd. (a).)  However, *over twenty years ago*, the Legislature
created a specific exception to this rule for cases involving sexual offenses.  Section 1108
provides, in pertinent part:  "In a criminal action in which the defendant is accused of a
sexual offense, evidence of the defendant's commission of another sexual offense or
offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible
pursuant to Section 352."  (§ 1108, subd. (a).)

### D.  Forfeiture

Defendant forfeited his contentions that section 1108 is unconstitutional, on its
face and as applied, because, as defendant candidly concedes, he did not raise these

25

contentions in the trial court.[10]  (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1099 [specific objection to § 1108 forfeited by failure to raise in trial court]; *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1314 [appellant forfeited any claims of error as to § 1108 testimony by failing to make a timely objection in the trial court on the grounds asserted for the first time on appeal].)  Additionally, with regard to defendant's as-applied contentions on appeal, defendant neither asserted before the trial court that the evidence should have been excluded pursuant to section 352 nor that the section 1108 evidence, coupled with CALCRIM No. 1191, weakened the burden of proof and allowed him to be convicted on less than proof beyond a reasonable doubt.  Defendant asserts that his "argument[s] [were] not forfeited because trial counsel was ineffective."  (Initial capitalization omitted.)

### E.  Ineffective Assistance of Counsel Claim

#### 1.  Ineffective Assistance of Counsel General Principles

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367.)  " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642], quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)  The reason why

---

[10]  Defense counsel did initially object to the admission of the section 1108 testimony concerning Ra., but then acknowledged "[a]s to 1108, her testifying to the similar conduct, I don't believe I have a basis to object to that."  Counsel argued other grounds for objection ("competency issues, immunity issues" related to pending criminal charges), which turned out to be based on the misidentification of Ra. and subsequently rendered moot when the parties identified the correct Ra.  Otherwise, as the parties agree, defense counsel did not object to the admission of the section 1108 evidence.

*Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.) As we shall explain, trial counsel's performance was not deficient and thus defendant has failed to carry his burden of establishing ineffective assistance of counsel.

### 2. California Authorities on the Constitutionality of Section 1108

As defendant acknowledges, our high court has rejected the claim he advances here, that section 1108 is unconstitutional on its face because it violates due process. In *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), our high court was faced with a due process challenge to section 1108 on the ground that it allows for the admission of "propensity" evidence and "conclude[d], consistent with prior state and federal case law, that section 1108 is constitutionally valid." (*Falsetta*, at p. 907 [rejecting due process claim].) Two years before *Falsetta*, another panel of our court concluded that section 1108 does not violate due process. (*People v. Fitch* (1997) 55 Cal.App.4th 172, 183.) These courts reasoned that the discretion afforded trial judges under section 352 to exclude such evidence when the probative value is outweighed by its prejudicial effect or other counterweight is " 'a safeguard against the use of uncharged sex offenses in cases where the admission of such evidence could result in a fundamentally unfair trial.' " (*Falsetta*, at p. 917, quoting *Fitch*, at p. 183.) " '*With this check upon the admission of evidence of uncharged sex offenses in prosecutions for sex crimes, we find that . . . section 1108 does not violate the due process clause.*' " (*Ibid.*) As we will discuss, for the same reason, federal courts have rejected due process claims related to the federal evidence counterparts to sections 1108 and 352, and have long allowed, over due process

challenges, the use of prior sex crimes and child molestation misconduct to show propensity.

"Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a),[11] imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, section 1108 implicitly abrogates prior decisions . . . indicating that 'propensity' evidence is per se unduly prejudicial to the defense." (*Falsetta, supra*, 21 Cal.4th at p. 911.) " 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*Id*. at pp. 911-912.)

Since *Falsetta*, the California Supreme Court has reiterated its position that section 1108 does not violate due process (*Villatoro, supra*, 54 Cal.4th at p. 1160; *People v. Reliford* (2003) 29 Cal.4th 1007, 1009), and has expressly adhered to *Falsetta* (*People v. Loy* (2011) 52 Cal.4th 46, 61 (*Loy*) [rejecting a defendant's request to reconsider *Falsetta*, noting that the defendant provided no good reason to do so]).

Thus, as defendant acknowledges, our high court has clearly ruled on the contention he advances here. Moreover, the court has signaled no changes on the

---

**11** Section 1101, subdivision (a), is the general prohibition against the use of character evidence to prove propensity or disposition and provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

horizon.  The trial court, and this court, are bound by our high court's decision in *Falsetta*.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).)  Under these circumstances, defense counsel cannot be said to have performed deficiently for failing to raise an objection that was without legal basis and completely meritless.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 (*Cudjo*) [failure to object to the admission of evidence is not ineffective assistance where "there was no sound legal basis for objection"].)

### 3. *McKinney* and Federal Authorities

Defendant more than once states that he "recognizes our Supreme Court has found section 1108 to be constitutional, but presents this pure question of law to preserve it for further review."  Defendant cites *McKinney, supra*, 993 F.2d 1378 and other older cases, in contending that admission of the section 1108 testimony violated his due process and a fair trial rights.  *McKinney* is often cited in this context.  However, as we have previously observed, a "[d]efendant's reliance on *McKinney*—a case decided before enactment of the federal rules allowing evidence of uncharged sexual assaults and child molestation and the enactment of section 1108—is misplaced.  [Citation.]  The application of *McKinney*'s holding in the context of [uncharged sexual misconduct] evidence has been repeatedly rejected.  [Citations.]  The Ninth Circuit and other federal courts have long since upheld the constitutionality of the federal rules allowing sexual misconduct evidence to establish propensity to commit such crimes."  (*People v. Holford* (2012) 203 Cal.App.4th 155, 183, fn. 19.)

Section 1108 was modeled after rule 413 of the Federal Rules of Evidence (rule 413, 28 U.S.C.).[12]  (*People v. Falsetta* (1999) 21 Cal.4th 903, 912 (*Falsetta*).)  The

---

[12]  Rule 413(a) provides in pertinent part:  "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed

29

federal court cases rejecting due process challenges to rules 413 and 414[13] are many and we have found no federal cases concluding that these rules of evidence offend due process.  Recently, in *United States v. Schaffer* (2d Cir. 2017) 851 F.3d 166, the Second Circuit noted that under rule 413, the prosecution "may use evidence of prior sexual assaults precisely to show that a defendant has a pattern or propensity for committing sexual assault."  (*Schaffer*, at pp. 177-178, fn. omitted.)  The *Schaffer* court observed: "While we recognize that Rule 413 represents an exception to the general 'ban against propensity evidence,' we agree with every other court of appeals that has addressed this issue and hold that, in light of the safeguards provided by Rule 403,[14] Rule 413 on its face does not violate the Due Process Clause."  (*Schaffer*, at p. 177, fns. omitted, & fn. 56, citing *United States v. Mound* (8th Cir. 1998) 149 F.3d 799, 801, *United States v. Enjady* (10th Cir. 1998) 134 F.3d 1427, 1430-1433 (*Enjady*), *United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1026-1027 (*LeMay*) & *United States v. Julian* (7th Cir. 2005) 427 F.3d 471, 487; see also *United States v. Castillo* (10th Cir. 1998) 140 F.3d 874, 880-881.)

In *McKinney*, a murder victim's throat was slit, and the medical examiner testified the wounds could have been caused by almost any kind of knife.  (*McKinney, supra,* 993

---

any other sexual assault.  The evidence may be considered on any matter to which it is relevant."

**13**  Federal Rules of Evidence, rule 414 (rule 414), provides, in pertinent part:  "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation.  The evidence may be considered on any matter to which it is relevant."  (Rule 414(a), 28 U.S.C., boldface omitted.)

**14**  Federal Rules of Evidence, rule 403 (rule 403, 28 U.S.C.), is the federal counterpart to section 352 and provides:  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

F.2d at p. 1381.)  A specific murder weapon was never identified.  (*Ibid.*)  The prosecution introduced evidence that the defendant had a knife collection of which he was proud and that he scratched on his dormitory closet door with a knife, "Death is His." (*Id.* at p. 1382.)  The Ninth Circuit concluded that this evidence was probative only of the defendant's character and its admission violated the prohibition against evidence of bad character.  (*Id.* at pp. 1384-1385.)  It further held that, because that prohibition is based on the community's sense of fair play and decency, the admission of the evidence violated due process.  (*Ibid.*)

However, in *LeMay*, the Ninth Circuit rejected reliance on *McKinney* in a case involving evidence of uncharged acts of child molestation admitted under rule 414. (*LeMay, supra*, 260 F.3d at pp. 1026-1027.)  The court noted that in *McKinney* it had held that propensity evidence "will only *sometimes* violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have.  Potentially devastating evidence of little or no relevance would have to be excluded under Rule 403.  Indeed, this is exactly what Rule 403 was designed to do.  We therefore conclude that as long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional."  (*LeMay*, at p. 1027.)  In light of the *LeMay* court's rejection of *McKinney* in the context of the admissibility of prior acts of child molestation to show propensity, defendant's reliance on *McKinney* is clearly misplaced.[15]  We expressly

---

[15]  Appellate counsel here would apparently have us ignore the federal authorities, including *LeMay*, because none of the federal cases published before this appeal were mentioned in defendant's briefing.  We remind counsel of our high court's admonition that "[a]ttorneys are officers of the court and have an ethical obligation to advise the court of legal authority that is directly contrary to a claim being pressed."  (*In re Reno* (2012) 55 Cal.4th 428, 510, citing *Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 82, fn. 9.)  As the court in *Reno* noted, "Rule 5-200 of the Rules of Professional Conduct addresses the issue and provides that, '[i]n presenting a matter to a

reject *McKinney* as grounds upon which to find that section 1108 is constitutionally invalid on its face and conclude that trial counsel's performance was not deficient for failure to rely upon it.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [failure to object to the admission of evidence is not ineffective assistance where "there was no sound legal basis for objection"].)

California's decisional law concerning the facial constitutionality of section 1108 and the federal analogues are settled and have been settled for some time.  We reject the contention as completely meritless, and thus we reject defendant's contention that his trial counsel provided constitutionally ineffective assistance of counsel.

### 4.  Constitutionality of Section 1108 as Applied

Defendant asserts that, had counsel objected to the admission of the evidence, the trial court would have engaged in a thorough analysis pursuant to section 352 and excluded the prior molestation evidence.[16]  Defendant also asserts, as part of his as-

---

tribunal, a member:  [¶]  (A) Shall employ . . . such means only as are consistent with truth; [and]  [¶]  (B) Shall not seek to mislead the judge . . . by an artifice or false statement of fact or law . . . .' "  (*In re Reno*, at p. 510.)  Relying on the Ninth Circuit's decision in *McKinney* to advance and preserve the contention that section 1108 is facially unconstitutional, appellate counsel here failed to cite pertinent and contrary federal authorities even though he was obligated to do so.

[16]  The record does not indicate that the trial court conducted an express section 352 weighing analysis in deciding to admit the subject evidence.  We note that reviewing courts " 'are willing to infer an implicit weighing by the trial court on the basis of record indications *well short* of an express statement.' "  (*Villatoro, supra*, 54 Cal.4th at p. 1168.)  We also note that section 1108, "expressly refers to section 352."  (*Villatoro*, at p. 1168.)  Further, the prosecutor in moving for the admission of this evidence in her written in limine motions specifically raised the fact that evidence otherwise admissible pursuant to section 1108 is subject to a section 352 balancing analysis.  Whether or not we should presume that the trial court indeed engaged in the required weighing analysis (see *Villatoro*, at p. 1168 [presuming that the court conducted the requisite weighing analysis based on language of § 1108 and trial court's reference to a key case which involved a § 352 analysis]), as we shall discuss, defendant's trial counsel's performance was not deficient for failing to make an objection on section 352 grounds.

applied challenge, that section 1108 evidence, coupled with CALCRIM No. 1191, diluted the burden of proof and allowed him to be convicted on the charged offenses on lesser proof than proof beyond a reasonable doubt.

### a. Section 352 Contention

Section 1108 expressly permits trial courts to exclude evidence of other sex crimes under section 352.  (*Falsetta, supra*, 21 Cal.4th at p. 916.)  Under section 352, "The court in its discretion may exclude evidence if its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create *substantial danger* of undue prejudice, of confusing the issues, or of misleading the jury."  (Italics added.)  The *Falsetta* court provided a non-exclusive list of factors for courts to consider in conducting a section 352 analysis relative to proposed section 1108 evidence, including:  "its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense."  (*Falsetta*, at p. 917.) Some of these factors are the considerations expressly set forth in section 352 and others are factors relevant to those considerations.

### (1)  Probative Value

" 'In enacting . . . section 1108, the Legislature decided evidence of uncharged sexual offenses *is so uniquely probative in sex crimes prosecutions* it is presumed admissible without regard to the limitations of . . . section 1101.' [Citation.]  Or, as another court put it, '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under . . . section 1101, otherwise . . . section 1108 would serve no purpose.  It is enough the charged and uncharged offenses

are sex offenses as defined in section 1108.' " (*Loy, supra*, 52 Cal.4th at p. 63, italics added.)

Defendant argues that had the trial court engaged in a closely reasoned weighing process after being prompted to do so by the section 352 objection trial counsel failed to make, the trial court would have found that "the prior crime was so similar to the charged offense as to have the highest degree of prejudic[e] attached to it" and thus the evidence should have been excluded as more prejudicial than probative. We partially agree with defendant; the uncharged conduct was very similar to the charged conduct. But defendant is mistaken about how courts should consider this circumstance. While similarity is not required, it is a circumstance that cuts in favor of admissibility. The more similar the uncharged events are to the charged offenses, the greater the probative value is of that evidence. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 [one factor to consider in a § 1108 case is "whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense"].) The similarity of the conduct here greatly enhanced the probative value of the uncharged conduct evidence to be weighed against the section 352 counterweights.

Defendant notes that his defense as to the charged victims and the section 1108 victims was that they all were lying and they conspired with his ex-wife to fabricate the allegations. He complains that the section 1108 evidence was "used to buttress the credibility of the charged victims." But again, defendant is mistaken as to how this circumstance should be considered. Credibility is precisely why the Legislature enacted section 1108, so "the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and defendant's credibility" in deciding the " 'credibility contest' " such cases present. (*Falsetta, supra*, 21 Cal.4th at p. 911; accord, *Villatoro, supra*, 54 Cal.4th at p. 1164 [legislative history noted " 'evidence that a particular defendant has such a propensity is especially probative and should be

considered by the trier of fact when determining the credibility of a victim's testimony' "].)  Similarly, "[i]n passing Rule 413, Congress considered '[k]nowledge that the defendant has committed rapes on other occasions [to be] critical in assessing the relative plausibility of [sexual assault] claims and accurately deciding cases that would otherwise become unresolvable swearing matches.' " (*United States v. Schaffer, supra*, 851 F.3d at p. 178, fn. omitted.)  Given the similarity, the uncharged evidence here was highly probative of the victims' testimony on the charged offenses.

Regarding the degree of certainty of the commission of the uncharged molestations, uncertainty can detract from the probative value of the evidence.  Here, only the evidence concerning Ra. involved any uncertainty.  As noted, she repeatedly testified that she did not remember defendant's prior conduct.  However, the evidence established that she was intentionally uncooperative because she had been pressured and intimidated by family.  Moreover, a recording of her prior statements in which she described the molestations and the provision of pills was played for the jury.  Even if we were to consider any uncertainty that developed as to the commission of defendant's misconduct relative to Ra. because of her lack of cooperation, we conclude that uncertainty did not detract from the probative value of the evidence.

### (2)  Danger of Undue Consumption of Time

The probative value was not substantially outweighed by the probability that admission of the evidence would necessitate an *undue* consumption of time.  The prosecution presented its first witness on Thursday, August 13, 2015, and defendant, the last witness at trial, finished testifying on Monday, August 24, concluding a total of five days of trial testimony.  Eleven witnesses testified for the prosecution and three for the defense.  Ra., the first witness to testify for the prosecution, was on the stand for no more than one hour five minutes, which included the playing of her recorded interview with

Detective Jacobo.  Ra.'s testimony spans 27 pages in the reporter's transcript.[17]  P. also testified on the first day of trial.  Her testimony lasted no more than 53 minutes.  Her testimony spans 37 pages in the reporter's transcript.  Thus, the testimony of both of these witnesses does not constitute the "avalanche of uncharged evidence" described by defendant.  "Conceivably a case could arise in which the time consumed trying the uncharged offenses so dwarfed the trial on the current charge as to unfairly prejudice the defendant."  (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [uncharged prior misconduct evidence consisting of 182 pages of reporter's transcript, 27 percent of the total trial transcript, was not an undue consumption of time].)  This is not such a case.

At the time the trial court granted the prosecution's request that P.'s and Ra.'s testimonies be admitted pursuant to section 1108, the trial court may not have known with precision the amount of time their testimony would involve.  However, based on the prosecutor's offer of proof as to both section 1108 victims, Ra.'s preliminary hearing testimony, Jacobo's testimony at the preliminary hearing concerning his interview with Ra., and the recording of his interview with Ra. which was also introduced into evidence at the preliminary hearing, the trial court could make an estimate and conclude that, whatever amount of time their testimony would take, it would not be undue and it would not take more time than the evidence related to the charged offenses.  Thus, under these circumstances and based on the proposed nature of their testimony, we conclude that the probative value of the section 1108 witnesses's testimony was not substantially outweighed by a substantial danger that its admission would necessitate undue consumption of time.

---

[17]  Relevant transcripts of her interviews with Jacobo occupy 27 pages in the clerk's transcript.

### (3)  Danger of Undue Prejudice

" ' "[T]he prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " ' "  (*People v. Holford, supra*, 203 Cal.App.4th at p. 167 (*Holford*), quoting *People v. Karis* (1988) 46 Cal.3d 612, 638.)  The danger of undue prejudice must be "substantial" and the evidence will not be excluded unless that " 'substantial danger' " " 'substantially' " outweighs the probative value of the evidence. (*Holford*, at p. 167 [noting that our high court has emphasized the word "substantial" in § 352 and thus "[e]vidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights"].)

Prejudice can result when the uncharged conduct is inflammatory compared to the charged conduct.  (See *People v. Harris* (1998) 60 Cal.App.4th 727, 737-738 (*Harris*) [concluding that the uncharged act evidence was "inflammatory *in the extreme*"].)  Here, the section 1108 evidence was not inflammatory as far as child molestation allegations go and it was certainly no more inflammatory than evidence related to the charged offenses. "This circumstance decreased the potential for prejudice."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*).)  Indeed, the charged offenses defendant committed against Ja., his biological daughter, were far more inflammatory given the duration of the abuse, the nature of the abuse, and the father-daughter relationship.

Remoteness can both detract from probative value and raise concerns of undue prejudice.  The probative value of the evidence to show propensity might be low if there is a significant lapse of time between the uncharged prior misconduct and the charged

offense.  There might be prejudice related to defendant's ability to defend against the uncharged conduct evidence if there is a significant lapse of time and witnesses or evidence are no longer available.  However, the uncharged acts committed against Ra. were no more remote in time than the earlier of the charged offenses, and the uncharged acts against P. were roughly contemporaneous with the charged acts committed against J. The circumstance that the events underlying the uncharged molestations was roughly around the same time as the charged molestations enhances the probative value of that evidence to show propensity to commit the charged offenses.  There was no gap in time during which the defendant led a blameless life.  (See *People v. Branch* (2001) 91 Cal.App.4th 274, 285 ["In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses," although "significant similarities between the prior and the charged offenses may 'balance[] out the remoteness' "; "remarkably similar" prior offense properly admitted despite 30-year gap between prior and charged offenses]; see also *Harris, supra*, 60 Cal.App.4th at pp. 738-739 [23-year gap between prior offense and charged offenses, during which the defendant allegedly led an "unblemished life," was "a long time" and the remoteness of the prior offense "weighs sharply in favor of exclusion"].)  Nor did remoteness make it more burdensome for defendant to defend against the uncharged offenses (see generally *Falsetta, supra*, 21 Cal.4th at p. 917), particularly because he was on notice of the prosecution's intent to present the section 1108 evidence long before trial and his defense against the charged and uncharged acts was precisely the same:  all of his accusers were lying as part of a conspiracy against him.

The uncharged acts did not result in criminal prosecutions or convictions, a circumstance which could give rise to the danger that the jury might have been inclined to punish defendant for those offenses, even if it did not consider him guilty of the charged offenses, thus increasing the danger of prejudice.  (*Ewoldt, supra*, 7 Cal.4th at p. 405.)  However, in light of the strong probative value of the evidence here, and the

absence of any other significant factors weighing against the admission of the evidence, this consideration alone was not enough to warrant exclusion under section 352, particularly in light of the presumption that section 1108 evidence is admissible based on its "uniquely probative" character.  (See *Loy, supra*, 52 Cal.4th at p. 62; *People v. Britt* (2002) 104 Cal.App.4th 500, 505-506.)

### (4)  Danger of Confusing and Misleading the Jury

The uncharged acts were also not likely to confuse the issues or mislead the jury. The proposed evidence itself was not confusing, and it was abundantly clear that defendant was not charged with any acts related to P. or Ra.  There was no reason to believe that the proposed testimony would distract the jurors from their main inquiry. And given the nature of the evidence the jury heard, we conclude that it did not.

### (5)  Section 352 Conclusion

Based on the information the trial court knew at the time it determined that P.'s and Ra.'s testimony would be admitted pursuant to section 1108, we conclude that there is virtually no possibility that, had defense counsel made a section 352 objection to this evidence, the court would have determined that the uniquely probative value of the evidence (*Loy, supra*, 52 Cal.4th at p. 63) would be " 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights."  (*Holford, supra*, 203 Cal.App.4th at p. 167.)  Under these circumstances, defendant's trial counsel cannot be said to have performed deficiently by not moving to exclude the evidence under section 352, a motion that would have had no hope for success.  (See *Cudjo, supra,* 6 Cal.4th at p. 616.)

### b.  CALCRIM No. 1191

Defendant's arguments implicating CALCRIM No. 1191 in his challenge to the constitutionality of section 1108 as applied overlap with his separate contention addressing CALCRIM No. 1191 and the preponderance of the evidence standard for considering uncharged acts, which we discuss in part II. of the Discussion, *post*.  As we

shall discuss, most of defendant's arguments have been repeatedly rejected as to the modern versions of the section 1108 instructions.  As to the one argument he makes that has apparently not been expressly addressed in a published case relative to CALCRIM No. 1191, we shall reject that argument as meritless.  Therefore, defense counsel cannot be deemed to have performed deficiently for failing to raise unmeritorious objections. (See *Cudjo, supra*, 6 Cal.4th at p. 616.)

## II.  CALCRIM No. 1191

### A.  Additional Background

The trial court instructed the jury with CALCRIM No. 1191 as follows:  "The People presented evidence that the defendant committed crimes of sexual assault upon minors, namely [Ra.] and [P.], which were not charged in this case.  The sexual assault crimes against [Ra.] and [P.] are defined for you in Instruction 1112. [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely.  [¶]  If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses and based on that decision, also conclude that the defendant was likely to commit the offenses as charged here.  If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to

prove that the defendant is guilty of the charged offenses.  The People must still prove the charge beyond a reasonable doubt."[18]

The prosecutor discussed the propensity evidence in her closing argument, stating, for example, "If you conclude that more likely than not those crimes occurred, you can use that as propensity evidence when you are evaluating the charged crimes.  In other words, you can conclude that this defendant is disposed or inclined to commit sexual offenses and, therefore, that he was more likely to have committed the crimes for which he's charged."  After detailing points from Ra.'s and P.'s testimony, the prosecutor stated, "So based on Ra.'s prior statements and P.'s testimony, you can conclude that the defendant has a propensity to commit sexual offenses, and you can build that into your evaluation of the current charges."

### B.  Defendant's Contentions

Defendant asserts that CALCRIM No. 1191 is flawed because it allows jurors to infer guilt based merely on the commission of other crimes established only by a preponderance of the evidence, effectively reducing the burden of proof and violating his due process rights.  More specifically, defendant asserts:  "The instruction tell[s] jurors

---

[18]  When the trial court read CALCRIM No. 1191 to the jury, twice it interposed the word "others" for the term "the charged offenses."  However, the trial court corrected itself as it finished reading the instruction to the jury, and the written jury instructions, as corrected in handwriting, accurately reflect the correct instruction.  Additionally, in reading the instruction to the jury, it appears that the trial court omitted the last sentence reading, "The People must still prove the charge beyond a reasonable doubt."  However, the written jury instructions included this sentence.  "We of course presume 'that jurors understand and follow the court's instructions.' "  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)  "This presumption includes the written instructions."  (*Ibid*.)  " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' "  (*People v. Mills* (2010) 48 Cal.4th 158, 201.)  Because the jury was given the correctly worded instruction in written form, and because, on appeal, we give precedence to the written instructions (*ibid*.), we disregard the error in the oral reading which was not raised by either party.

that they may ignore the general presumption of innocence and infer guilt based, not on
their evaluation of the evidence of the present offense, but upon their finding of another
sexual offense by a lower standard of proof."  Defendant emphasizes that, while the
instruction does state that jurors may not find a defendant guilty based only on uncharged
offenses, it neither reiterates the presumption of innocence nor "counter[s] the effective
presumption of guilt permitted by the language of the instruction."  Defendant further
asserts that CALCRIM No. 1191 is confusing, internally inconsistent and inconsistent
with the instruction on circumstantial evidence.  He concedes that the California Supreme
Court has approved of a substantially similar instruction and that this court is bound by
our high court's precedent, but again states that he is raising the issue to preserve it for
federal review.[19]  While defendant acknowledges that trial counsel did not object to

---

[19]  We note that federal district courts are required to "make a preliminary finding that a
jury could reasonably find by a preponderance of the evidence that the defendant
committed the [uncharged sexual offense] and that it constituted an 'offense of sexual
assault' for purposes of Rule 413."  (*United States v. Dillon* (5th Cir. 2008) 532 F.3d 379,
387, citing *United States v. Guidry* (5th Cir. 2006) 456 F.3d 493, 501, 503, fn. 5; *Enjady,
supra*, 134 F.3d at p. 1433; *Johnson v. Elk Lake School Dist.* (3d Cir. 2002) 283 F.3d
138, 152-155; see also *Watkins v. Meloy* (7th Cir. 1996) 95 F.3d 4, 6 [noting that "[p]roof
of prior bad acts, where it is permitted, requires only a preponderance of the evidence,
rather than proof beyond a reasonable doubt as in a criminal trial"].)  Similarly, evidence
proffered pursuant to rule 414, must be sufficient to support a finding by a preponderance
of the evidence that the defendant committed the subject acts.  (*United States v. McHorse*
(10th Cir. 1999) 179 F.3d 889, 899 [discussing the admission of such evidence based on a
rule 403 balancing].)  A number of the federal circuits do not appear to require that the
district courts instruct jurors that before they consider such evidence, they must find that
the prosecution established the uncharged acts by a preponderance of the evidence, or by
any particular standard, but instead these district courts only instruct the jurors as to the
purposes for which the evidence may be used.  (E.g., 9th Cir. Crim. Jury Instns. (2010)
Instn. No. 2.12 <http://www3.ce9.uscourts.gov/jury-instructions/node/328> [as of
Nov. 28, 2018], archived at <https://perma.cc/SC2K-AYGN> ["You are about to hear
evidence that the defendant [may have committed] [was convicted of] a similar offense of
[sexual assault] [child molestation].  [¶]  You may use this evidence to decide whether the
defendant committed the act charged in the indictment.  You may not convict the
defendant simply because he [may have committed] [was convicted of] other unlawful

CALCRIM No. 1191, he asserts that, because the issue affects his substantial rights, he may raise this issue for first time on appeal.

## C. Forfeiture

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)  As defendant asserts, however, we may review his contention concerning an instruction given "if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259.)  " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 (*Ramos*).)  We next consider the merits and reject defendant's contentions.

## D. Analysis

Our high court has held that CALJIC No. 2.50.01, the predecessor to CALCRIM No. 1191, is a correct statement of the law.  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160, citing *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016 (*Reliford*) [requiring § 1108 evidence be proved by a preponderance of the evidence does not reduce the prosecution's burden of proof as to the charged offenses].)  For the purpose of evaluating

---

acts.  You may give this evidence such weight as you think it should receive or no weight.  [¶]  [You may not use this evidence, however, to decide whether the defendant [*insert improper purpose, e.g., made a statement in this case or destroyed evidence in this case*].]"; *id.*, Instn. No. 2.13 <http://www3.ce9.uscourts.gov/jury-instructions/node/323> [as of Nov. 28, 2018], archived at <https://perma.cc/2DL4-XV42> [limited purpose of evidence].)  However, in the Eighth Circuit, courts do instruct the jury that they may consider the uncharged sexual misconduct only if the jurors unanimously find that the evidence "is more likely true than not true." (8th Cir. Crim. Jury Instns. (2017) Instn. No. 2.08A, p. 41 <http://www.juryinstructions.ca8.uscourts.gov/Criminal-Jury-Instructions-2017.pdf> [as of Nov. 28, 2018], archived at <https://perma.cc/SGL7-BARZ>.)

defendant's claims, there is no material difference between CALCRIM No. 1191 and its predecessor CALJIC No. 2.50.01.  (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480; *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87.)  Thus, relying on *Reliford*, the Courts of Appeal for the Second District and this district have concluded that CALCRIM No. 1191 is also correct statement of the law and does not reduce the prosecution's burden of proof.  (*People v. Anderson* (2012) 208 Cal.App.4th 851, 895-898; *Cromp*, at p. 479; *Schnabel*, at p. 87.)  Defendant's arguments here concerning CALCRIM No. 1191—purported reduction of the burden of proof, the instruction allows jurors to find a defendant guilty solely based on prior uncharged acts, and that the instruction is confusing and misleading because it employs a different standard of proof for the prior sexual offense findings than for the jury's ultimate determination of guilt—are all foreclosed by our high court's analysis and conclusions in *Reliford*.  (*Reliford*, at pp. 1013-1016.)  As this court noted in *Schnabel*, "[w]e are in no position to reconsider the Supreme Court's holding in *Reliford* [citation], and by analogy to *Reliford*, we reject defendant's argument regarding the jury instruction on use of his prior sex offenses." (*Schnabel*, at p. 87, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

However, defendant makes one argument not expressly addressed by our high court in *Reliford* and not addressed in any case published since *Reliford*.  Defendant contends that the asserted confusion engendered by CALCRIM No. 1191 was compounded by CALCRIM No. 224, the instruction on circumstantial evidence. Defendant focuses on the first paragraph in CALCRIM No. 224, which reads in pertinent part:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have

proved each fact essential to that conclusion beyond a reasonable doubt."[20]   Defendant asserts that CALCRIM No. 1191 contradicts CALCRIM No. 224 because the former tells the jurors that, if they conclude that the prosecution established *by a preponderance of the evidence* that defendant committed the prior sexual offenses, the jurors may conclude from that evidence that defendant was likely to commit the charged offenses.   CALCRIM No. 224 addressing circumstantial evidence, on the other hand, tells the jurors that each fact essential to a conclusion of guilt must be proved beyond a reasonable doubt.   We reject defendant's contention for three reasons.   First, in advancing this argument, defendant relies on a case that predated *Reliford* and addressed an earlier, flawed version of the section 1108 instruction.   Second, the reasoning in *Reliford* concerning section 1108 evidence and subsequent cases from our high court concerning section 1108 and section 1101, subdivision (b), evidence compels rejection of defendant's claim.   Third,

---

[20]   It is not clear why the trial court gave CALCRIM No. 224, which should not be used when the circumstantial evidence is incidental to and corroborative of direct evidence. (*People v. Malbrough* (1961) 55 Cal.2d 249, 250-251; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1270-1271 [noting that the CALJIC predecessor to CALCRIM No. 224 should not have been given in a sexual assault case based on the testimony of the victim and the defendant on the issue of consent-no consent]; see also *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 86-87 [circumstantial evidence instruction not required where the prosecution was based on witness testimony and the defendant's admissions]; Judicial Council of Cal., Crim. Jury Instns. (2018) Bench Notes to CALCRIM No. 224, p. 52.)   The instant prosecution was a direct evidence case as to defendant's conduct; any circumstantial evidence of defendant's conduct was corroborative of the direct evidence presented by the testimony of the victims. Nevertheless, because the evidence at issue here was circumstantial evidence of defendant's propensity and a propensity is not only circumstantial evidence defendant may have committed the charged crime (*Falsetta, supra*, 21 Cal.4th at p. 915; *People v. Karis* (1988) 46 Cal.3d 612, 636), but also has some bearing on the requisite intent and/or mental state, it would have been appropriate to give CALCRIM No. 225.   That instruction pertains to circumstantial evidence used to prove the requisite intent or mental state and contains the same language as that in CALCRIM No. 224 upon which defendant focuses.   Defendant makes no argument about the use of CALCRIM No. 224 instead of 225 and thus we have no occasion to further discuss it.

the wording of CALCRIM No. 1191 clearly tells juries that even if they find defendant committed the uncharged sexual misconduct, the reasonable doubt standard still applies to the charged offenses.

Defendant relies on *People v. Frazier* (2001) 89 Cal.App.4th 30 (*Frazier*), a case decided nearly two years before *Reliford*, in contending that the current section 1108 and circumstantial evidence instructions are in conflict.  The problem with defendant's position is that *Frazier* involved a prior version of the section 1108 instruction.  That instruction, an earlier version of CALJIC No. 2.50.01, told juries that " '[i]f you find the defendant committed a prior sexual offense, you may but are not required to infer that the defendant had a disposition to commit sexual offenses.  If you find the defendant had this disposition, you may, but are not required to infer that he was likely to *and did commit* the crimes of which he is accused.' "  (*Frazier*, at p. 34.)  Also, the instruction did not include the cautionary instruction added in a later version of CALJIC No. 2.50.01, which stated:  " 'However, if you find by a preponderance of the evidence that the defendant committed prior sexual offenses, *that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes.*' "  (*Frazier*, at pp. 34-35, fn. omitted.)  The *Frazier* court held that the instruction was constitutionally infirm because it told jurors they could convict the defendant of the charged offenses based solely on their determination he had committed prior sexual offenses.  (*Id*. at p. 35.)  The court reasoned that the "and did commit" language told jurors that "proof of prior sexual offenses is enough to prove guilt of the current offenses" (*id.* at p. 36, fn. omitted) and no instruction countered or made up for the message that jurors could convict solely based on a determination that the defendant committed the prior offenses (*id*. at p. 35).  The court then went on to address the People's contention that defects in an instruction can be viewed as harmless when cured by other instructions.  (*Id*. at p. 36.)  On this point, the court reasoned that the combination of the preponderance of the evidence standard to determine whether the defendant had committed the prior offenses and the circumstantial

evidence instruction, which told the jury each fact supporting an inference essential to establish guilt must be proven beyond a reasonable doubt, added to the confusion.  (*Id*. at pp. 36-37.)  "If the jury believed the propensity evidence was essential to establish defendant's guilt, then [the circumstantial evidence instruction] was in direct conflict with [the preponderance of the evidence instruction]."  (*Id*. at p. 37, fn. omitted.)  The confusion that results from "attempting to apply the [trial] court's instructions 'as a whole,' " the court reasoned, would tempt juries "to take the path of least resistance which leads directly from evidence of the defendant's disposition to a guilty verdict." (*Ibid*.)  Based on all of these reasons, the court concluded the older version of the section 1108 instruction it reviewed denied the defendant due process because it allowed the jury to convict him without proof beyond a reasonable doubt as to every element of the charged offenses.  (*Frazier*, at p. 37.)  *Frazier* has not been relied upon in any published case for its discussion concerning the section 1108 and circumstantial evidence instructions.

CALCRIM No. 1191 does not suffer from the same shortcomings as the section 1108 instruction analyzed in *Frazier*.  Those shortcomings were corrected in later versions of CALJIC No. 2.50.01 and do not appear in CALCRIM No. 1191.  The "and did commit" language has long since been eliminated.  (See *People v. James* (2000) 81 Cal.App.4th 1343, 1348, fn. 8 [suggesting that the " 'and did commit' " language be omitted from CALJIC instruction].)

Furthermore, despite the fact that the revised CALJIC No. 2.50.01 instruction in *Reliford* included the "and did commit" language (*Reliford, supra*, 29 Cal.4th at p. 1012), the court nevertheless approved of the instruction.  The revised instruction the *Reliford* court reviewed instructed that if jurors found by a preponderance of the evidence that the defendant committed the uncharged offenses, that finding was not sufficient by itself to prove beyond a reasonable doubt that the defendant committed the charged crimes.  (*Id*. at p. 1013.)  "By telling jurors that evidence of prior offenses is insufficient to prove

defendant's guilt of the charged offenses beyond a reasonable doubt, jurors necessarily understand that they must consider all the other evidence before convicting defendant." (*Id.* at p. 1015.)[21]

CALCRIM No. 1191 includes similar language in addition to other important admonitions.  In addressing when and how juries may consider evidence of prior acts of sexual misconduct under section 1108, CALCRIM No. 1191 tells jurors:  (1) they may not even consider the evidence unless it is proved by a preponderance of the evidence; (2) if they decide that standard is met, they "*may, but are not required* to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses"; (3) based on that decision, they may conclude that the defendant was likely to commit the charged offenses (not that he *did commit* the charged offenses); (4) the determination the defendant committed the prior misconduct "*is only one factor to consider along with all the other evidence*"; (5) the determination the defendant committed the prior acts is "*not sufficient by itself to prove that the defendant is guilty* of" the charged offenses; and (6) "[t]he People must *still* prove" the charge "beyond a reasonable doubt."  (Italics added.) Consistent with *Reliford*, CALCRIM No. 1191 cautions jurors that the propensity inference is not sufficient to prove the charged offenses; it also does not include the "and did commit" language the *Frazier* court found so problematic.

Moreover, our high court's discussion in *Reliford* concerning the circumstantial evidence instruction convinces us that defendant's position lacks merit.  In sanctioning the preponderance of the evidence standard for considering section 1108 evidence, the court in *Reliford* actually relied upon the fact that the jury had been given instructions on

---

**21**  Later, in *Loy*, another case reviewing a section 1108 instruction that included the "and did commit" language, our high court observed that, while "[i]t is no doubt useful to admonish the jury specifically that evidence of the prior sexual offense alone is not sufficient to convict," it is not critical.  (*People v. Loy* (2011) 52 Cal.4th 46, 74 (*Loy*).)

circumstantial evidence and the burden of proof regarding the charged offenses. "Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense . . . . The instructions instead explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' [Citations.] . . . In addition, the jury was told that circumstantial evidence could support a finding of guilt of the charged offenses only if the proved circumstances could not be reconciled with any other rational conclusion [citation]—which is merely another way of restating the reasonable-doubt standard. [Citation.] The jury thus would have understood that a conviction that relied on inferences to be drawn from defendant's prior offense would have to be proved beyond a reasonable doubt." (*Reliford, supra*, 29 Cal.4th at p. 1016.) Thus, it is apparent our high court saw no conflict between the section 1108 instruction and the circumstantial evidence instruction.

In *Loy, supra*, 52 Cal.4th 46, our high court further discussed circumstantial evidence in the context of approving a section 1108 evidence instruction. The court observed that the earlier version of CALJIC No. 2.50.01 under consideration there, "merely told the jury it could 'infer' from defendant's prior sexual crimes that he committed the charged crime. It did not say such an inference itself constituted proof beyond a reasonable doubt. The jury was also instructed that 'an inference is a deduction of fact that can logically and reasonably be drawn from another fact or group of facts established by the evidence.' [Citation.] But a *logical deduction* is not the same as *proof beyond a reasonable doubt.* No reasonable jury would assume that this inference, i.e., this logical deduction, substituted for proof beyond a reasonable doubt. The instructions given 'provide only that an inference of guilt *may be drawn* from prior offenses that have been proved by a preponderance of evidence. They do *not* suggest that an inference so drawn is *sufficient* for a *finding* of guilt.' [Citation.] The jury still had to find that the

49

facts of the charged crime had been proved beyond a reasonable doubt." (*Loy*, at p. 75.) The same could be said for CALCRIM No. 1191.

Our high court's discussion of the circumstantial evidence instruction in *Reliford* and circumstantial evidence in general in *Loy* is consistent with the court's more recent discussion specific to the circumstantial evidence instruction and the preponderance standard as it relates to section 1101, subdivision (b), uncharged misconduct evidence.[22] Our high court has explained that the beyond a reasonable doubt standard of proof applicable to circumstantial evidence generally and the preponderance of the evidence standard applicable to other crimes evidence "are reconciled by the different purposes for which the evidence is used.  When evidence of uncharged misconduct is admitted for the purpose of establishing identity or intent, we have explained that the crimes are mere 'evidentiary facts.' [Citation.]  The jury cannot consider them at all unless they find them proven by a preponderance of the evidence.  'If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered.  [Citations.]' [Citation.]  If the jury finds the facts sufficiently proven for consideration, it must still decide whether the facts are sufficient, taken with all the other evidence, to prove the defendant's guilt beyond a reasonable doubt." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1259-1260 (*Virgil*), citing *People v. Medina* (1995) 11 Cal.4th 694, 763 & *People v. Foster* (2010) 50 Cal.4th 1301, 1347-1348 (*Foster*).)  In *Virgil, Foster*, and *Medina*, the uncharged misconduct evidence was admitted to prove identity.  (*Virgil*, at p. 1258; *Foster*, at pp. 1346-1348; *Medina*, at pp. 747-748.)  Identity is an ultimate fact, as are the elements of the crime which must be

---

[22]  Section 1101, subdivision (b), provides prior misconduct may be admitted for a noncharacter purpose such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented."

proved beyond a reasonable doubt.  (*People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 13.)  Propensity is considered an intermediate fact.  (*Id*. at p. 317, fn. 17.)  An intermediate fact is a fact from which the existence of an ultimate fact may be drawn.  (*Id.* at p. 315.)  Unlike ultimate facts, the prosecution is under no obligation to prove intermediate facts to establish the charged offenses.  We see no reason why the reasoning from *Virgil*, *Foster*, and *Medina* concerning the section 1101, subdivision (b), instruction pertaining to the ultimate fact of the identity of the perpetrator should not apply to section 1108 evidence admitted to show the intermediate fact of propensity, a fact the prosecution is not required to prove to establish the charged offenses.

Lastly, the final sentence in CALCRIM No. 1191 tells jurors, "[t]he People must *still prove*" the charge "beyond a reasonable doubt."  (Italics added.)  Thus, the jurors are effectively admonished that, even if they find defendant committed the uncharged sexual misconduct, the reasonable doubt standard "still" applies to the charged offenses.[23]

We conclude that the jurors could readily understand the distinction drawn, and the differing burdens of proof attached to CALCRIM Nos. 224 and 1191.  We further conclude that it is not reasonably likely a jury would conclude that the lower standard of proof applicable to the uncharged offenses would apply to the proof of the charged offenses.  (*Reliford, supra*, 29 Cal.4th at pp. 1012-1016.)

To the extent that defendant's contentions are not foreclosed by binding precedent from our high court, we conclude that they lack merit.

---

[23] We may also consider the argument of counsel in determining the effect on a jury of purported confusion or ambiguity in jury instructions.  We note the prosecutor said nothing that would cause the jury to convict of the charged offenses based solely on the propensity evidence or to convict him of the charged offenses based on the preponderance of the evidence standard.

### III.  Child Sexual Abuse Accommodation Syndrome Evidence

### A.  Additional Background

Dr. Anthony Urquiza testified as an expert for the prosecution on the topic of CSAAS.  CSAAS consists of five emotional behaviors that have been observed in children who have experienced sexual abuse:  (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed disclosure; and (5) retraction.  (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 389 (*Bowker*).)

Urquiza testified that that CSAAS, established by Roland Summit in 1983, serves the purpose of educating therapists who are treating children who have been sexually abused in an effort to teach them "about the context in which abuse happens, what are the common characteristics, common behaviors, common things that abused children -- sexually abused children do, and to dispel any misperceptions or myths that those therapists may have had about sexual abuse."  Urquiza testified that CSAAS "is an educational tool initially designed to educate therapists about common characteristics of sexual abuse" and "[i]t is not and should not be used as a diagnosis of any type."  On cross-examination, Urquiza acknowledged that CSAAS starts with the premise that the child has been sexually abused, and is used to better understand the victim.  Urquiza testified that there are five components of CSAAS.

The first component, secrecy, addresses why a child would keep sexual abuse a secret.  Among the ways someone may coerce a sexually abused child to keep the abuse secret are overt threats, intimidation, and affection, in which the perpetrator may provide the victim with "special attention, gifts, favors, affection, make them feel really good and wanted, sometimes maybe even make them feel loved."  Perpetrators may make statements to dissuade the victims from disclosing the abuse, such as indicating that disclosure could lead to breaking up the family, the child would be sent to foster care, and the child would not be believed.  Urquiza testified that abusers sexually abuse victims while others are in the house "all the time."  He testified:  "That's part of what sexual

abuse is about, keeping the secret, not allowing other people to know what's going on. And other family members, mom, siblings, usually don't know what goes on."

The second component is helplessness. Because sexual abusers of children are often in a preexisting, ongoing relationship with the child, the abuser has power and control over the child, and there is "really nothing you can do." In such circumstances, it is not reasonable to expect the victims to initiate self-protective behavior.

The third component is entrapment and accommodation. Entrapment, according to Urquiza, essentially refers to the fact that the victim is "stuck" in the situation; the victim cannot tell anyone, cannot do anything about the fact that they are going to be abused again, and are helpless. Additionally, Urquiza testified that there is "lots of guilt involved in being sexually abused." He continued: "We know that in a perpetrator-victim relationship, the person who's responsible is the perpetrator. But that's not clear in the mind of the victim when they're being abused. They think maybe there's something that they did that contributed to the abuse or they should have done something. So they often get confused about guilt and responsibility." Victims have to try to learn how to cope with the circumstances. Among the coping mechanisms, Urquiza discussed dissociation.

The fourth component is delayed and unconvincing disclosure. According to Urquiza, because of the factors at work, it is reasonable for there to be a lengthy delay in reporting instances of sexual abuse. Urquiza testified that most victims do not disclose for months or years, and delayed disclosure is pretty common. Further, because some children may make an initial disclosure, and, if the response is supportive, make successively more detailed disclosures, the disclosure may seem unconvincing because there are many versions of the disclosure.

The final component of CSAAS is retraction. According to Urquiza, 20 to 25 percent of children who have been sexually abused and disclose the abuse retract the allegations. Among the factors that can contribute to retraction include pressure exerted

on the victim, affection for or closeness to the perpetrator, and awareness that the perpetrator will face negative consequences as a result of the disclosure.

On cross-examination, Urquiza testified that, while rare, false allegations of child sex abuse do happen. He testified that such false allegations occur in a range of one to six percent of cases.

In her closing argument, defense counsel asserted that Urquiza's testimony was "pretty much inapplicable when we're talking about false accusations. And he said that himself. He said the center [*sic*] he discusses doesn't apply to cases of false accusations."

The prosecutor, in her rebuttal closing argument, also mentioned Urquiza's testimony, specifically in the context of describing factors that increase the likelihood that a victim will recant.

### B. Defendant's Contentions

Defendant asserts that the trial court abused its discretion in admitting CSAAS evidence which, according to defendant, was irrelevant and unduly prejudicial in violation of his right to due process and a fair trial. Defendant asserts that the behaviors allegedly indicative of CSAAS are equally consistent with individuals making false accusations and can easily be misconstrued as corroboration of victim claims. Defendant asserts that "CSAAS testimony lacks foundation, is misleading, involves an undue consumption of time, and misleads and confuses the jury." According to defendant, no witness had recanted, and if delayed reporting was not a misconception held by the jury, there was no basis for the introduction of CSAAS evidence. Defendant also asserts, more broadly, that the reason that CSAAS testimony was once warranted no longer exists, as it is now common knowledge that children recant, delay in reporting, and do not report. Defendant asserts that CSAAS testimony amounts to "pseudoscience" designed to secure convictions in that it merely bolsters the credibility of child victims. Defendant further asserts that other jurisdictions have found CSAAS evidence inadmissible, and that

CSAAS evidence does not satisfy the *Kelly*/*Frye* test for admissibility.[24]  However, defendant does recognize that California courts have routinely admitted CSAAS evidence.

### C.  Forfeiture

Ordinarily, the failure to object to the admission of evidence, including expert testimony, forfeits a claim on appeal that the evidence was improperly admitted.  (§ 353, subd. (a); *People v. Stevens* (2015) 62 Cal.4th 325, 333.)  Defendant acknowledges that he did not object to the admission of the CSAAS evidence in the trial court, thus forfeiting his contention on appeal.  (See *People v. Dykes* (2009) 46 Cal.4th 731, 756 ["numerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)  Under a separate heading, defendant asserts that, on this basis too, he was denied the constitutionally effective assistance of counsel.

### D.  Ineffective Assistance of Counsel

In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our high court approved of the decisions of Courts of Appeal that had held that CSAAS testimony is admissible for some purposes.  (*Id*. at p. 1300.)  *McAlpin* was followed by *People v. Brown* (2004) 33 Cal.4th 892, which upheld the use of expert testimony concerning battered women's syndrome and which expressly did so based on similar reasoning to that in *McAlpin*. (*Brown*, at pp. 905-907.)  It is well-settled that CSAAS evidence is admissible for the limited purpose it was admitted for in this case.  (*McAlpin*, at pp. 1300-1301.)  We are bound by our high court's reasoning in these cases.  (See *Auto Equity Sales, supra*, 57 Cal.2d 450; see also *People v. Perez* (2010) 182 Cal.App.4th 231, 245 (*Perez*).)

---

[24]  *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

While CSAAS testimony is inadmissible to prove that a molestation occurred, it is nevertheless admissible " 'to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting— is inconsistent with his or her testimony claiming molestation.' " (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001, quoting *McAlpin, supra*, 53 Cal.3d at pp. 1300-1301.) CSAAS evidence has been held admissible " ' "to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' " (*Sandoval*, at p. 1002, quoting *McAlpin*, at p. 1301.) " 'For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.  Where an alleged victim recants his [or her] story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings.  In the typical criminal case . . . , it is the People's burden to identify the myth or misconception the evidence is designed to rebut.' " (*Sandoval*, at p. 1002, quoting *Bowker, supra*, 203 Cal.App.3d at p. 394.)

"Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation.  It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*).)  Inconsistencies in the victim's statements may also support the use of CSAAS evidence.  (*Perez, supra*, 182 Cal.App.4th at p. 245.)  Additionally, "[a]dmission of evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal.

56

The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility." (*Patino*, at p. 1745.)

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*McAlpin, supra*, 53 Cal.3d at p. 1299.)

Defendant concedes that "California courts have generally admitted CSAAS evidence to 'dispel myths' concerning the behavior of child molestation victims." However, defendant asserts that CSAAS evidence does not meet the legal requirements for the admissibility of scientific evidence and should not have been admitted at his trial. As stated *ante*, we are bound by our high court's reasoning in cases such as *McAlpin, supra*, 53 Cal.3d 1289, concluding that CSAAS evidence is admissible for some purposes. (See *Auto Equity Sales, supra*, 57 Cal.2d at p. 455.) Defendant's contention that the myths no longer exist is not supported by any evidence in the record whatsoever. Thus, his arguments that CSAAS testimony was once warranted but the underlying reason for such testimony no longer exists, and that it is now "common knowledge" that children recant, delay in reporting, and do not report are insufficient to counter binding precedent from our high court. Similarly, in the face of binding precedent from our high court, the fact that other jurisdictions may exclude CSAAS evidence does not affect our determination.

Moreover, the purposes for which CSAAS evidence may be properly admitted were very much at issue in this case. Here, the defense raised in its opening statement Ja.'s early inconsistent statements about whether defendant was molesting her, telling R. that he was and then telling law enforcement that he was not. Also in its opening statement, the defense emphasized that the witnesses had "given inconsistent statements." The victims' substantial delay in reporting the abuse (with the exception of L.) and their inconsistent statements were at issue and raised throughout trial.

57

As for defendant's *Kelly/Frye* challenge, that contention has been rejected by California courts.  (*People v. Housley* (1992) 6 Cal.App.4th 947, 954-956 (*Housley*); *Bowker, supra*, 203 Cal.App.3d at pp. 391-394.)  The *Kelly/Frye* test does not prohibit the use of CSAAS evidence in the manner it was employed in this case.  (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449.)

The trial court instructed the jury with CALCRIM No. 1193,[25] stating in relevant part:  "Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.  [¶]  You may consider this evidence only in deciding whether or not the conduct of [J., L., Ja., Ra.,] and/or [P.] was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of that person's testimony."[26]  "We of course presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson, supra*, 44 Cal.4th at p. 803 (*Wilson*).)

The admission of CSAAS evidence did not render defendant's trial fundamentally unfair in violation of due process.  (*Patino, supra*, 26 Cal.App.4th at p. 1747.)  Since the CSAAS testimony was properly admitted under California law and did not violate defendant's due process rights, trial counsel's performance cannot be said to be deficient for failing to object on those grounds.  (*Cudjo, supra*, 6 Cal.4th at p. 616.)[27]

---

[25]  We discuss CALCRIM No. 1193 further in part IV. of the Discussion, *post*.

[26]  The trial court gave the jury a similar instruction immediately prior to Urquiza's testimony.

[27]  Although defendant does not cite section 352 in his argument concerning CSAAS, he does assert that CSAAS testimony, among other things, "involves an undue consumption of time, and misleads and confuses the jury."  Contrary to defendant's contentions, this evidence did not necessitate an undue consumption of time or mislead or confuse the jury.  Urquiza testified for just over two hours.  Urquiza made very clear on cross-examination that he was only testifying about CSAAS generally, and was not offering any opinion about defendant, the alleged victims, or whether the allegations were true.  In

## IV.  CALCRIM No. 1193

### A.  Additional Background

Defense counsel did not object to CALCRIM No. 1193, concerning CSAAS, at the jury instruction conference or at any other time.

### B.  Defendant's Contentions

Defendant asserts on appeal that CALCRIM No. 1193 impermissibly allowed the jury to use the CSAAS evidence to evaluate the believability of the victims' testimony. Defendant asserts that, if CSAAS is properly admissible, it is only for the limited purpose of determining whether the alleged victim's reactions were not inconsistent with molestation.  He asserts that CALCRIM No. 1193 improperly instructs the jury that it may use this evidence "to corroborate the claims of abuse."  This, he argues, reduced the prosecution's burden of proof in violation of his federal and state constitutional rights to due process and a fair trial.[28]  Defendant emphasizes that the predecessor to CALCRIM No. 1193, CALJIC No. 10.64, did not include language instructing the jury that it could consider CSAAS evidence to determine the victims' credibility.  Defendant asserts that, like his contention concerning CALCRIM No. 1191, he may assert this argument

---

any event, defendant forfeited any section 352 objection to the CSAAS evidence by failing to raise it in the trial court.  (*People v. Valdez* (2012) 55 Cal.4th 82, 138.) Furthermore, given that defendant does not actually even raise section 352 in reference to the CSAAS evidence, he apparently does not claim that his trial counsel was constitutionally ineffective for failing to make an objection to that evidence on section 352 grounds.

[28]  Defendant also asserts, in cursory fashion, that " '[e]qual protection' requires that persons similarly situated receive equal treatment."  However, he otherwise does not develop this argument, cite supporting authority, identify similarly situated groups or individuals, suggest how he has been treated differently, or even mention the concept of equal protection again in his briefing.  Any equal protection claim has been forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [appellant forfeits any point not supported by reasoned argument and citations to authority].)

notwithstanding the absence of an objection to the instruction in the trial court because the instruction violated his substantial rights.  (Pen. Code, § 1259.)[29]

## C.  Analysis

As with defendant's contention concerning CALCRIM No. 1191, defendant did not object to this instruction in the trial court.  For the same reasons set forth in part II.C. of the Discussion, *ante*, we shall address the merits of defendant's contentions.  (See Pen. Code, § 1259; *Ramos, supra*, 163 Cal.App.4th at p. 1087.)

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled."  (*People v. Tate* (2010) 49 Cal.4th 635, 696.)

CALCRIM No. 1193, as given, was explicit in stating that Urquiza's testimony "is not evidence that the defendant committed any of the crimes charged against him."  It further delineated the only permissible uses for the testimony, which were to determine whether the victims' conduct was not inconsistent with the conduct of someone who has been molested, and to evaluate the believability of their testimony.  This provided a clear and correct statement of the law.  (See *McAlpin, supra*, 53 Cal.3d at p. 1300.)

Contrary to defendant's contention, a jury may rely on CSAAS evidence to evaluate a child witness's credibility; CSAAS evidence is admissible to rehabilitate a child victim's credibility when the defendant raises the possibility that the victim's behavior—such as failure to report, delays in reporting, or recanting—is inconsistent with actually having been abused.  (*McAlpin, supra*, 53 Cal.3d at p. 1300.)  Our high court has expressly stated that CSAAS evidence, used appropriately and as intended, may assist the trier of fact, "by giving the jurors information they need[] to objectively evaluate" the

---

[29]  Here, defendant also purports to rely on Penal Code section 1469.  However, that section applies to appeals in misdemeanor and infraction cases, not felony cases such as this.

credibility of alleged victims. (*McAlpin*, at p. 1302.)  Under the appropriate circumstances, CSAAS evidence is "properly admitted to rehabilitate [a child victim]'s credibility and to explain the pressures that sometimes cause molestation victims to falsely recant their claims of abuse." (*Housley, supra*, 6 Cal.App.4th at p. 956.) CALCRIM No. 1193 instructs the jury on this permissible use of CSAAS evidence.

We disagree with defendant's contention that CALCRIM No. 1193 erroneously instructs the jury it may use the CSAAS evidence to "corroborate" claims of abuse. CALCRIM No. 1193 does no such thing.  Instead, it makes clear that CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him."

A reasonable juror would understand CALCRIM No. 1193 to mean that the jury could use Urquiza's testimony to conclude that the victims' behavior does not mean that they lied when they claimed, belatedly and/or inconsistently, that they were abused.  The jury also would understand that it could not use Urquiza's testimony to conclude that any of the victims were, in fact, molested.  "The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [an expert]'s testimony will find both that [the victim]'s apparently self-impeaching behavior does not affect [his or] her believability one way or the other, and that the CSAAS evidence does not show [he or] she had been molested.  There is no conflict in the instruction." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)

When considered in context with the instructions as a whole, we conclude there is no reasonable likelihood the jury misapplied CALCRIM No. 1193 to reduce the prosecution's burden of proof.  The instruction informs the jury that expert CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him."  It also informs the jury that CSAAS testimony may only be used to decide whether the victims' behavior was not inconsistent with the behavior of someone who has been molested, and to evaluate their credibility.  The instruction did not permit the jury to find any of the victims credible based solely on the opinion of Urquiza, who

expressed no opinion concerning the victims, their credibility, or the specific allegations of the case.  The jury was also properly instructed on the burden of proof and the reasonable doubt standard (CALCRIM No. 220), and the factors it should consider in evaluating a witness's credibility (CALCRIM No. 226).  Additionally, the jury was instructed with CALCRIM No. 303, as follows:  "During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other."  We presume the jury understood and applied all of these instructions. (*Wilson, supra*, 44 Cal.4th at p. 803.)  Read as a whole, the instructions did not lower the prosecution's burden of proof or allow the jury to use CSAAS testimony for an improper purpose.  We conclude that defendant has failed to demonstrate that the trial court's CALCRIM No. 1193 instruction was erroneous.

## V.  Cumulative Error

Defendant asserts that the judgment should be reversed due to cumulative error. According to defendant, even if we find the errors to be harmless individually, the cumulative effect of these asserted errors discussed in parts I. through IV. of the Discussion, *ante*, deprived him of a fair trial.  We reject this contention.

The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect may require reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.)  We have reviewed all of defendant's claims and find no error; thus, there is no cumulative prejudicial error warranting reversal.

## VI.  Consecutive Sentences on Counts One and Two
### A.  Defendant's Contentions

Defendant asserts that the trial court failed to exercise its discretion, and abused its discretion, in imposing consecutive sentences on counts one and two, assertedly violating his due process rights.  Defendant argues that the crimes in counts one and two were committed at the same time against the same victim.  Defendant contends that, because

the trial court incorrectly concluded that these crimes were committed on separate occasions against different victims, the court abused its discretion in imposing consecutive sentences.  According to defendant, sentencing in this manner was "an abuse of discretion because . . . it showed that [the trial] court, rather than looking at the individual offender, had decided that [defendant] was to receive the maximum possible sentence without regard to the circumstances of each of his convictions."  Therefore, defendant argues that we should remand for resentencing.  We agree that remand is appropriate.

### B.  Additional Background

In sentencing defendant, the trial court stated:  "First of all, I found the testimony of the victims who testified in the trial to be very credible.  I know [defendant] contends that, basically, he has been framed and falsely accused.  I find that to be outrageous under the circumstances.  I found the testimony of the victims was very credible.  [¶]  I feel that throughout this case that I presided over for many, many months and more than just the trial, I have gotten some insight into [defendant]'s character.  He is a relentlessly manipulative person.  He just keeps coming.  He doesn't stop.  There's no end to his attempts to manipulate other individuals weaker than himself to serve his own selfish interests.  [¶]  I am going to impose the maximum sentence on this matter.  The probation report for the most part is accurate; but I find that [its] omission, the failure to reference the uncharged victims, P. and Ra., to be a deficiency.  [¶]  I am amazed that the testing that was done on [defendant] somehow reflects that he is at low risk to re-offend.  I think my intuition suggests otherwise.  [¶]  [Defendant] has not acknowledged any responsibility for any of his acts and multiple victims, multiple young women that have been victimized by him.  [¶]  I am going to follow the recommendation of the Probation Department and choose Count 32, the charge of furnishing ecstasy to a minor, Ja., to be the principal term and impose the upper term of nine years.  [¶]  I choose the upper term because the evidence demonstrated that there were multiple incidences of that crime

63

having been committed; and I agree that [defendant] should be incarcerated for the maximum term that the law permits, so I impose the upper term of nine years for that count.  [¶]  The remaining crimes and convictions, I intend to impose consecutive sentencing as permitted by law.  Count 33, a violation of [section] 11380 of the Health and Safety Code, I impose the midterm, reduced by two-thirds, and run consecutive because that's a separate offense committed on a separate occasion.  [¶]  Actually, there were multiple occasions when that offense was committed as well, like Count 32.  [¶] *Regarding Count 1, violation of [Penal Code section] 289(i), again, I impose one-third of the midterm, which amounts to eight months, and order that to be run consecutive.*  [¶] *Likewise, Count 2, violation of [Penal Code section] 288a(b), another eight months, which is one-third the midterm.*  [¶]  Counts 3, 4 and 16 through 31 are all violations of Penal Code Section 288(c)(1).  As recommended by the Probation Department, I order the defendant to be sentenced to one-third the midterm as to each count, which in total is 12 years.  [¶] *Each of those crimes was committed on a separate occasion against several victims, and they warrant consecutive sentencing*.  [¶]  Counts 5 through 15 are all violations of [Penal Code section] 288(a).  As recommended by the Probation Department, I impose an additional 22 years, calculated as one-third the midterm for each count.  [¶]  It was clear to me from the testimony that the crimes for which the defendant was found guilty by the jury, based on the charges by the prosecution, represent actually only a portion of the number of instances in which he victimized young women.  [¶]  The aggregate prison term is 46 years and four months."  (Italics added.)

## C.  Analysis

Penal Code section 669 "grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes."  (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.)  "The sentencing rules specify several criteria to guide the trial court's determination whether to impose consecutive or concurrent terms."  (*Ibid*.)  California Rules of Court, rule 4.425, sets forth factors to be considered by the

trial court in deciding whether to impose consecutive or concurrent sentences.**30**  "Only one criterion or factor in aggravation is necessary to support a consecutive sentence." (*People v. Davis* (1995) 10 Cal.4th 463, 552.)  We review the trial court's determination to impose consecutive sentences for abuse of discretion.  (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)  "Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered."  (*Ibid*.)

"The court shall state the reasons for its sentence choice on the record at the time of sentencing."  (Pen. Code, § 1170, subd. (c).)  Thus, generally, when a trial court chooses to impose consecutive sentences, it is required to state its reasons for doing so. (Rule 4.406(b)(5).)  "If the sentencing judge is required to give reasons for a sentence choice, the judge must state in simple language the primary factor or factors that support the exercise of discretion.  The statement need not be in the language of the statute or these rules.  It must be delivered orally on the record.  The court may give a single statement explaining the reason or reasons for imposing a particular sentence or the exercise of judicial discretion, if the statement identifies the sentencing choices where discretion is exercised and there is no impermissible dual use of facts."  (Rule 4.406(a), boldface omitted.)

---

**30**  "**Factors** affecting the decision to impose consecutive rather than concurrent sentences include:  [¶]  **(a)  Facts relating to crimes**  [¶]  Facts relating to the crimes, including whether or not:  [¶]  (1) The crimes and their objectives were predominantly independent of each other;  [¶]  (2) The crimes involved separate acts of violence or threats of violence;  or  [¶]  (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior.  [¶]  **(b) Other facts and limitations**  [¶]  Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except:  [¶]  (1) A fact used to impose the upper term;  [¶]  (2) A fact used to otherwise enhance the defendant's sentence in prison or county jail under section 1170(h); and  [¶]  (3) A fact that is an element of the crime may not be used to impose consecutive sentences."  (Cal. Rules of Court, rule 4.425.) Further undesignated citations to rules are to the California Rules of Court.

Referencing rule 4.425(a)(3), the probation report stated, "The crimes in Counts 1-33 were committed at different times or separate places, rather than being committed so close in time and place as to indicate a single period of aberrant behavior."  The probation report further stated that consecutive sentencing was "being recommended relative to Rule 4.425(a)(3)" for the same reasons.

Counts one and two both involved J. as the victim.  Defendant was found guilty on count one of sexual penetration of J., a victim under 16 years of age (Pen. Code, § 289, subd. (i)), and, on count two, of oral copulation with J., a victim under 16 years of age (Pen. Code, § 288a, subd. (b)(2)).  With regard to the allegations in these counts, J. testified that, one day when she was 14, she took a shower and then, wearing only a towel, she went into a bedroom to get dressed.  Defendant entered the room, started touching J., and tried to get her towel off.  J. told defendant to stop, but defendant reassured her that he was not going to hurt her.  Defendant eventually got J.'s towel off, laid her on the bed, touched her breasts, opened her legs, caressed her vagina, and performed oral sex on her.  Defendant also inserted two fingers in J.'s vagina.  Defendant attempted to place his penis in J.'s vagina.  J. said no.  Defendant's penis pushed against J.'s vagina "but it wouldn't go and then [J.] told [defendant] that [she] wasn't ready and then he stopped."  Defendant then left the room.

In sentencing defendant, the trial court stated, "Each of those crimes was committed on a separate occasion against several victims, and they warrant consecutive sentencing."  Defendant, assuming that this statement contemplates counts one and two as well as other counts, asserts that the trial court was incorrect on this point, because the two counts involving J. were committed at the same time against the same victim.  Additionally, defendant points out that defense counsel raised this issue prior to the trial court's imposition of sentence, encouraging the trial court to impose concurrent terms on "the counts that happened at the same time and place, such as the counts in Count 1 and 2 and the counts involving" J. and L.

66

The People assert that "there is no indication that the trial court believed consecutive sentences were statutorily mandated due to counts 1 and 2 being committed on separate occasions," and that "review of the record demonstrates that the trial court exercised its discretion in determining that the sentences on counts I and II should run consecutively and did not premise this sentence on an assumption they were committed on separate occasions. While the trial court did state that 'Each of those crimes was committed on a separate occasion against several victims, and they warrant consecutive sentencing,' it is clear that this finding was in relation to counts III, IV and XVI through XXXI as specifically stated by the court." The People further insist that the trial court "made no such finding as to counts I and II." The People's position is that the trial court "simply stated that it intended to impose consecutive sentencing as to the remaining convictions as permitted by law."

We conclude that it is not clear from the record why the trial court imposed consecutive terms on counts one and two. It is possible, as the People assert, that the trial court's statement that "[e]ach of those crimes was committed on a separate occasion against several victims, and they warrant consecutive sentencing," was not meant to encompass counts one and two and the reasons for imposing consecutive sentences on those counts, but rather that statement only addressed counts three, four, and sixteen through thirty-one. The single-sentence paragraph in which the trial court made this statement immediately follows a paragraph addressing counts three, four, and sixteen through thirty-one.

On the other hand, the paragraph in which the trial court made this statement is not so limited by its terms and could address counts one and two as well. Additionally, it is worth reiterating here that the sole basis in the probation report for the recommendation of imposing consecutive terms on all counts, with reference to rule 4.425(a)(3), is that "[t]he crimes in Counts 1-33 were committed at different times or separate places, rather

than being committed so close in time and place as to indicate a single period of aberrant behavior."

If the trial court was indeed relying on the grounds set forth in the probation report as supporting consecutive sentences—that these crimes "were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior"—it failed to sufficiently articulate its findings in this regard as to counts one and two.  The crimes charged in those counts were committed against the same victim at the same location.  However, as the People assert, consecutive terms may be imposed for separate acts committed during a single episode of sexual assault.  (See, e.g., *People v. Jimenez* (2002) 99 Cal.App.4th 450, 456 [a defendant sentenced, in part, to consecutive terms for three separate violations of same child molestation statute based on single incident during which the defendant fondled three separate portions of victim's body]; *People v. Harrison* (1989) 48 Cal.3d 321, 324-326 [consecutive sentences for separate acts of penetration during sexual assault].)  Based on proper findings, it may be possible for the court to impose consecutive sentences on counts one and two.  The People thus maintain that the trial court may have imposed consecutive sentences because the "crimes involved separate acts of violence or threats of violence."  (Rule 4.425(a)(2).)  However, if this was the basis for the trial court's decision, it is not clear from the transcript of the sentencing hearing.

Of course, the trial court may have elected to impose consecutive sentences on counts one and two for different reasons.  These reasons could be other factors set forth in rule 4.425 or other reasons reasonably related to the sentencing decision. (Rule 4.408(a).)  However, such reasons are not set forth in the record.

Accordingly, we shall vacate the sentences imposed on counts one and two and remand the matter to the trial court for resentencing on those counts, at which the trial court shall impose concurrent or consecutive sentences and if it chooses to impose consecutive sentences, articulate the reasons for its choice.

## VII.  Fines and Fees

We note that, during the oral pronouncement of sentence, the trial court did not clearly impose a court operations assessment and a criminal conviction assessment on each count, although it did state at one point, "I order the mandatory -- any other mandatory charges, including penalty assessments and surcharges and lab analysis fees, if appropriate."  The abstract of judgment does not indicate that the trial court imposed the court operations assessments and criminal convictions assessments.  To the extent that the trial court at sentencing could be deemed not to have imposed these fees, this was error.  Both of these fees are statutorily mandated.  (Pen. Code, § 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1); see also *People v. Alford* (2007) 42 Cal.4th 749, 754 [court operations assessment is mandatory for all convictions]; *People v. Robinson* (2012) 209 Cal.App.4th 401, 405 [court operations and criminal conviction assessments "are a required part of [a] defendant's sentence and may be corrected on appeal"].)  Failure to impose mandatory fees, fines, penalties, and assessments constitutes an unauthorized sentence, which may be corrected by an appellate court even in the absence of an objection or argument below.  (*People v. Turner* (2002) 96 Cal.App.4th 1409, 1413-1415.)  At defendant's resentencing, we direct the trial court to clearly impose a court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)) and a criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) for each conviction.

## DISPOSITION

The sentences imposed on counts one and two are vacated and the matter is remanded to the trial court for resentencing on those counts, at which the trial court shall choose to impose concurrent or consecutive sentences, articulate the reasons for its choice if it chooses to impose consecutive sentences, and impose a court operations assessment and a criminal conviction assessment on each of the 33 counts as stated herein.  The trial court is then directed to prepare an amended abstract of judgment and

forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.


_____
MURRAY, Acting P. J.


We concur:


_____
HOCH, J.


_____
RENNER, J.

IN THE

# Court of Appeal of the State of California

**IN AND FOR THE**
**THIRD APPELLATE DISTRICT**

MAILING LIST

Re:   The People v. Phea
      C080488
      Sacramento County
      No.      13F01371

Copies of this document have been sent by mail to the parties checked below unless they were noticed electronically.   If a party does not appear on the TrueFiling Servicing Notification and is not checked below, service was not required.

Angelo S. Edralin
Office of the State Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Office of the State Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Malanje Phea
CDC #: AY0622      DOB: 03/19/1970
Kern Valley State Prison
P.O. Box 3130
Delano, CA 93216

Allen G. Weinberg
Attorney at Law
9454 Wilshire Boulevard, Suite 600
Beverly Hills, CA 90212

Central California Appellate Program
2150 River Plaza Drive, Suite 300
Sacramento, CA 95833

Honorable Timothy M. Frawley
Judge of the
Sacramento County Superior Court
720 Ninth Street
Sacramento, CA 95814